Derry Family Division
No. 2005-776

IN THE MATTER OF MOISES CHOY AND ELSA CHOY

Argued: October 18, 2006
Opinion Issued: January 18, 2007

*Brian G. Germaine, P.A.*, of Derry (*Brian G. Germaine* on the brief and orally), for the petitioner.

*Law Office of Barbara J. Griffin*, of Manchester (*Barbara J. Griffin* on the brief and orally), for the respondent.

BRODERICK, C.J. The petitioner, Moises Choy (father), appeals an order recommended by a Marital Master (*Cross*, M.) and approved by the Derry Family Division (*Sadler*, J.) granting a motion by the respondent, Elsa Choy (mother), to modify custody and child support. We affirm.

The record supports the following. The Choys were divorced in August 2003, after nearly nine years of marriage. They had one child, a son, age seven. According to the divorce decree, the Choys were awarded joint legal and physical custody of their son. The father was awarded custody "[e]very week from Thursday at 5:00 p.m. until the following Sunday evening at 6:00 p.m." The divorce decree further provided that "[u]nder this shared custodial agreement [the child] shall attend school in Derry, New Hampshire." The father resides in Derry, and the mother lives in Manchester.

In February 2004, the father filed a verified *ex parte* motion seeking a change of custody, alleging, in part, that the mother's boyfriend frequently struck the child and that the mother and her boyfriend engaged in sexual activity in front of him. The father requested that he be granted sole physical custody and that a guardian ad litem (GAL) be appointed for the child. In response to this, the trial court ordered, among other things, that "[t]he custodial provisions of the Divorce Decree ... be implemented forthwith."

In addition to moving for sole custody, the father also contacted the New Hampshire Division for Children, Youth and Families (DCYF) to report the alleged physical abuse of his son and sexual impropriety by the mother and her boyfriend. DCYF investigated and determined that the allegations were unfounded.

Shortly after the trial court issued its order requiring the immediate implementation of the custodial provisions in the divorce decree, which included a requirement that the child be enrolled in school in Derry, the mother filed a motion for *ex parte* relief, asking that she be allowed to enroll her son in the Manchester school system because she lived in Manchester and her son had been attending school there since the start of the academic year. The trial court ruled that, "[p]ending further court order, the child shall be allowed to continue to attend the Manchester school system."

In July, the trial court assigned a GAL for the child and directed her to investigate and report on four issues: (1) modification of physical custody; (2) visitation; (3) the parenting skills of both parents; and (4) the suitability of the home environment provided by both parents. At the time of the GAL's appointment, the only pending motion to modify custody was the one filed by the father. In October, after the GAL was appointed but before she had prepared her report, the mother also filed a motion to modify custody in which she sought sole physical custody of her son.

The GAL's investigation involved four meetings with the child, four meetings with the mother, three meetings with the father, two meetings with the mother's boyfriend, and one meeting with the child's teacher. Among other things, the GAL noted in her April 2005 report that the father: (1) talked openly in front of his son in a derogatory way about the mother; (2) coached his son to provide false and negative information about his mother and threatened him with corporal punishment if he refused to do so; and (3) took his son to Florida without his mother's knowledge and directed him to keep the trip a secret from his mother, which distressed the child to the point where, according to his teacher, he asked her "what to do when you are asked to keep a secret from your parent." The GAL also reported that the father "loves his son more than anything in the world . . . [and] is fiercely protective," and that the child "loves his father and . . . wants to spend time with [him] but he does not want to have to hear, say or report bad things about his mother as I believe he is currently being told to do." Based upon her findings, the GAL concluded:

> I also believe that if the situation were left as it is that over a period of time [the father] would influence [his son] so greatly and with such dominance that [his] relationship with his mother

will be damaged. If [he] lives with his mother, I believe that he will be able to maintain his relationship with his father in a significant way.

Based upon that conclusion, the GAL recommended "that [the mother] be awarded primary physical [custody] of [the boy] while still providing substantial time with [the father]."

The master subsequently held a two-day hearing on both parties' motions to modify custody. Shortly before day two of the hearing, the father contacted the GAL alleging that the mother had physically abused their son and that her boyfriend had verbally abused him. By order dated July 21, 2005, the trial court accepted the master's recommendation and granted the mother's motion to modify custody. In its order, the trial court noted that the child "lives in an environment of extraordinary hostility, the majority of which is caused by [his father], and is given far too much negative information about his mother" and that of the two parents, the mother appeared to be the one more able to foster a good relationship between the child and the other parent. Based upon those and other findings, the trial court adopted the GAL's recommendations concerning the custodial schedule, which included: (1) granting the mother primary physical custody; (2) granting the father custody on alternate weeks, from Thursday after school until Monday morning; (3) granting the father custody from Thursday after school until Friday morning on those weeks when he does not have custody for the entire weekend; and (4) allowing the child to attend school in the district where his mother resides. The trial court determined that the evidence met the standard in RSA 458:17, V(a)(3) (2004) (repealed 2005 and recodified at RSA 461-A:11, I(c) (Supp. 2006)), which allows modification of a permanent custody order upon proof by clear and convincing evidence that the child's present environment is detrimental and that the advantages of the proposed modification outweigh any harms likely to be caused by the change in environment. In addition, the court found that the evidence satisfied the standard in RSA 458:17, V(a)(5) (2004) (repealed 2005), which allows modification of a permanent custody order when each party asserts that the original arrangement is not working and the proposed modification is found to be in the best interests of the child. With respect to paragraph V(a)(3), the trial court found "that the present environment is detrimental to the child's mental and emotional health and that the advantage of modifying custody outweighs the likelihood of harm to be caused by the change in environment." The trial court further explained that the child would "benefit from spending more of his time with his mother, who is far more

supportive of his father and their relationship, and will consequently not be as often subjected to his father's alienation." This appeal followed.

According to the father, the trial court erred by misapplying RSA 458:17 and unsustainably exercised its discretion by placing too much reliance upon the GAL's report and disregarding the evidence that he presented.

We will not overturn a trial court's modification of a child custody order unless it clearly appears that the court unsustainably exercised its discretion. *In the Matter of Fulton & Fulton*, 154 N.H. 264, 270 (2006). However, we review a trial court's statutory interpretation *de novo*. *In the Matter of Giacomini & Giacomini*, 151 N.H. 775, 776 (2005).

The father presents two legal arguments: (1) that the trial court erred by applying RSA 458:17, V(a)(5) because, contrary to the plain language of the statute, both parties were not asserting that the original joint custody arrangement was not working at the time of the hearing on the mother's motion to modify; and (2) that absent a finding of a change in circumstances, the court was not entitled to rely upon RSA 458:17, V(a)(3). Because the trial court correctly applied paragraph V(a)(3) to the facts in this case, we need not address the father's argument concerning paragraph V(a)(5).

RSA 458:17, V(a)(3) provides that a trial court may modify a permanent custody order if it "finds by clear and convincing evidence that the child's present environment is detrimental to the child's physical, mental, or emotional health and that the advantage to the child of modifying a permanent custody order outweighs the harm likely to be caused by the change in environment." In support of its ruling, the trial court noted: (1) the father's anger and hostility toward the mother, expressed in the presence of the child; (2) the various ways in which the father involved the child in his dispute with the mother and attempted to turn the child against his mother; and (3) the demonstrable negative effects of the father's behavior upon his son, as observed by the child's teacher, his counselor and the GAL. The father argues, however, that the trial court misapplied RSA 458:17, V(a)(3) because the "pattern of mutual recrimination [between him and the mother] has been consistent since their divorce [and] does not present a change in the child's living environment."

In *Perreault v. Cook*, 114 N.H. 440 (1974), we articulated the standard for trial courts to use in determining whether to modify a child custody arrangement: "The relationship established by the custody award should not be disturbed unless the moving party demonstrates that the circumstances affecting the welfare of the child have been so greatly altered that there is a strong possibility the child will be harmed if he continues to live under the present arrangement." *Id.* at 443.

In 2000, the General Court enacted a new version of RSA 458:17, V, *see* Laws 2000, ch. 145, repealing the previous version that had provided, in part, that "[e]xcept as provided in this paragraph, nothing in this section shall be construed to alter the standard for modification of a custody decree affecting physical custody of the child or children." RSA 458:17, V (Supp. 2000) (repealed 2000). At the time the new version of paragraph V was enacted, the standard for modification of a custody decree was the one we had established in *Perreault. See In the Matter of Pasquale and Paulson*, 146 N.H. 652, 654 (2001).

In the father's view, *Perreault*'s requirement of a change in circumstances survived the 2000 revision of RSA 458:17, V, and because the trial court did not find, as a factual matter, any change in circumstances, it committed legal error by ruling that the mother had met the standard in RSA 458:17, V(a)(3). If the intent of the legislature was to codify, by statute, the *Perreault* standard, then the father's argument might have merit. *See In the Matter of Hunt and Hunt*, 146 N.H. 65, 66-67 (2001). But the legislature did not codify *Perreault*; it replaced the *Perreault* standard with a new one.

The version of RSA 458:17, V enacted in 2000 was characterized in the legislative history as a codification of the "circumstances under which a parent can ask the court to change permanent child custody," N.H.H.R. JOUR. 322 (2000), and as an effort to "help those filing pro se to find [the legal standard for modifying custody] in statute rather than having to research case laws as well," *id*. In other words, the 2000 enactment both codified the legal standard for modifying child custody and replaced *Perreault*. The legislature indicated its intent to replace *Perreault*, rather than simply restate the rule of that case, by: (1) eliminating the caveat in the former version of paragraph V providing that the statute was not to be construed to alter the *Perreault* standard; (2) establishing a standard different from the standard stated in *Perreault*; and (3) stating, in the legislative history, that the statute was intended to allow litigants to learn the correct legal standard without "having to research case laws."

■ The 2000 version of paragraph V, unlike *Perreault*, said nothing about a change in circumstances, and thus we conclude that the legislature intentionally chose not to require the moving party to plead and prove a change in circumstances as a prerequisite to relief under RSA 458:17, V(a)(3). Although we will not construe a statute as abrogating the common law unless the statute clearly expresses such an intention, *Hill v. Dobrowolski*, 125 N.H. 572, 575 (1984), the statute at issue here, reinforced by the legislative history, clearly expresses the legislature's intent to replace the legal standard we established in *Perreault*. We now hold that

the *Perreault* standard was superseded by the enactment of RSA 458:17, V(a)(3).

■ Because RSA 458:17, V(a)(3) replaced the standard enunciated in *Perreault*, and did not include a change in circumstances requirement, it is of no consequence that the mother did not plead or prove a change in her son's circumstances. Accordingly, the trial court did not commit an error of law by ordering a modification of custody without evidence of a change in circumstances.

The father next argues that the trial court unsustainably exercised its discretion by: (1) failing to take into account any evidence supporting his assertions; (2) ignoring evidence casting doubt upon the credibility of the mother; and (3) relying almost entirely upon the GAL's report, which he characterizes as incomplete and biased.

■■ The trial court has wide discretion in matters involving custody and visitation. *In the Matter of Kosek & Kosek*, 151 N.H. 722, 724 (2005). That discretion necessarily extends to matters such as assigning weight to evidence and assessing the credibility and demeanor of witnesses. Conflicts in the testimony, questions about the credibility of witnesses and the weight to be given testimony are for the trial court to resolve. *Richelson v. Richelson*, 130 N.H. 137, 143 (1987). Our review is limited to determining whether it clearly appears that the trial court engaged in an unsustainable exercise of discretion. *Fulton*, 154 N.H. at 270. "This means that we review only 'whether the record establishes an objective basis sufficient to sustain the discretionary judgment made,'" *In the Matter of Lockaby & Smith*, 148 N.H. 462, 465 (2002) (quoting *State v. Lambert*, 147 N.H. 295, 296 (2001)), and we will not disturb the trial court's determination if it could reasonably be made, *Matthews v. Matthews*, 142 N.H. 733, 735 (1998).

■ Although the father contends that the trial court engaged in an unsustainable exercise of discretion by ruling as it did, a closer examination reveals that his real contention is that the trial court was erroneously persuaded by evidence unfavorable to his position and that it was unpersuaded by other evidence favorable to his position. Choosing between contradictory testimony and evidence is the essence of judicial discretion, and there is nothing in this record constituting an unsustainable exercise of that discretion. Accordingly, we find no merit in the father's arguments that the trial court failed to take into account evidence supporting his assertions and ignored evidence casting doubt upon the credibility of the mother.

We now turn to the father's contention that the trial court erred in relying upon the GAL's report which, he asserts, was based upon a faulty investigation. As the father correctly points out, we have held that the recommendations of a GAL do not, and should not, carry any greater presumptive weight than the other evidence in a case. *Richelson*, 130 N.H. at 143. While the trial court did rely upon the GAL's report, its ruling also discussed other evidence including: (1) the parties' own testimony; (2) the testimony of a witness to a specific incident involving the Choys and their son; and (3) the seemingly self-contradictory nature of the father's various allegations that the mother was harming the child—one made just days before the continuation of the hearing before the master—and his statement that the joint custody arrangement was working well. Given the trial court's discussion and analysis of a range of evidence, we cannot say that it gave unreasonable weight to the GAL's recommendations. Moreover, it is not our role to calculate how much weight a trial court should accord specific evidence. It is for the trial court to make that determination. *In re Guardianship of E.L.*, 154 N.H. 292, 296 (2006).

Nor do we conclude that the trial court committed an unsustainable exercise of discretion by crediting a report that, in the father's view, was unfairly biased against him due to the GAL's decisions not to contact any of the references he submitted to her and not to view videotapes and other materials that resulted from the DCYF investigation. At the time of the GAL's appointment, the only pending request for a change of custody was the one filed by the father, in which he made serious allegations against the mother and her boyfriend. Thus, as the GAL explained at the hearing, she focused her investigation upon the mother and her boyfriend. While the father complains that the GAL's report was biased against him because the GAL contacted some of the mother's references but none of his, he does not indicate what information may have been available from those contacts or suggest how that information would have altered the GAL's report if it had it been collected. Moreover, there was nothing that prevented the father from calling his references as witnesses at the hearing and in that way counterbalancing any perceived bias in the GAL's report. In any event, because the GAL gave a reasonable explanation for why she proceeded as she did, the record establishes an objective basis for the trial court's reliance upon her testimony and report.

The record also establishes an objective basis for the trial court's reliance upon the GAL's testimony even though she did not examine the materials collected during the DCYF investigation. The GAL testified that she: (1) discussed the DCYF investigation with someone from DCYF; (2) conducted her own investigation and reached the same conclusion as DCYF; and (3) was aware, through multiple sources, of the information

contained in the videotapes produced as part of the DCYF investigation. Moreover, because the DCYF investigation resulted in a determination that the charges against the mother and her boyfriend were unfounded and the GAL independently investigated the matter, it is difficult to see what additional information favorable to the father could have resulted from the GAL's examination of the DCYF file. The father offers only the suggestion that the DCYF "file contains videotapes and other information that would reflect the other side of the story and, therefore, give balance to the Guardian ad Litem report." As with the father's argument concerning the GAL's decision not to contact his references, the record establishes an objective basis for the trial court's reliance upon the GAL's report, notwithstanding her decision not to examine the actual DCYF case file.

Because the trial court committed no errors of law and did not unsustainably exercise its discretion, we affirm its decision to modify the custody order in this case.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.