Salem Family Division
No. 2005-604

IN THE MATTER OF JAMES J. PEIRANO AND SHARON L. LARSEN

Argued: April 3, 2007
Opinion Issued: July 20, 2007

*The Legal Connection, P.C.*, of Concord (*Michael Bedard* on the brief and orally), for the petitioner.

*Harvey & Mahoney, P.A.*, of Manchester (*J. Campbell Harvey* on the brief and orally), for the respondent.

HICKS, J. The petitioner, James J. Peirano, Jr., appeals from a final order of the Salem Family Division (*Hurd*, J.). The respondent, Sharon L. Larsen, cross-appeals. We affirm in part, reverse in part and remand.

## I. Background

The record supports the following. The petitioner and the respondent married in May 1991 and had one child in January 1992. In August 2000, a domestic violence final order was issued against the petitioner pursuant to RSA chapter 173-B (2002 & Supp. 2006) based upon the respondent's allegation that he assaulted her on July 14, 2000, while she was attempting to leave the house with their daughter. As a result, the petitioner was ordered to temporarily relinquish his numerous firearms and was prohibited from purchasing or obtaining any firearms during the pendency of the order. *See* RSA 173-B:5, II (2002). The order also awarded custody of the parties' daughter to the respondent, while providing for unsupervised visitation with the petitioner three days a week. In November 2000, the Derry Family Division issued an *ex parte* order limiting the petitioner to supervised visitation for reasons which are unclear from the record. In conjunction with the domestic violence order, the Derry Family Division appointed a Guardian Ad Litem (GAL) for the parties' daughter.

In September 2000, the petitioner filed a petition for legal separation in the superior court, alleging that irreconcilable differences caused the irremediable breakdown of the marriage. Following a temporary hearing in November 2000, the court issued an interim decree ordering the respondent to pay the petitioner $1,800 per month as temporary spousal support. The respondent and her attorney were not present at the hearing due to a mistake on their part regarding the date of the hearing.

On November 18, 2000, the respondent filed a cross-petition seeking a fault-based divorce based upon the petitioner's extreme cruelty, or, in the alternative, the petitioner's treatment of the respondent which injured her health and endangered her reason. *See* RSA 458:7, III, V (2004). The respondent requested: a "disparate share" of the marital estate under RSA 458:16-a, II (2004) due in part to the fault of the petitioner; and a permanent restraining order consistent with the requirements of 18 U.S.C. § 922(d)(8) (2000). The respondent also filed a motion requesting that the court hold a temporary hearing to reconsider the November 13, 2000 alimony order *nunc pro tunc*. Without holding a hearing, the court granted the motion to reconsider over the petitioner's objection. The court also transferred the matter to the Derry Family Division, where the domestic violence proceeding was held, at the request of the respondent.

In November 2000, the GAL filed a motion to withdraw, which was granted by the Derry Family Division. The court then appointed Debora A. Blake as the GAL for the parties' daughter. It was later revealed during her testimony that although Blake was a Massachusetts attorney, she was not licensed to practice law in New Hampshire.

In June 2001, the petitioner's supervised visitation rights were terminated by the Merrimack County Supervision Center because the petitioner failed to follow the center's rules regarding visitation procedures. The petitioner has not seen his daughter since then.

In September 2001, after an August 2001 restraining order had expired, the Brentwood Family Division extended the order until August 2002. Although the petitioner had not harassed or bothered the respondent for several months, the court noted that the parties were going through a contentious divorce and found that the respondent was in fear for her safety.

In August 2004, the respondent filed a "Motion for Immediate *Ex Parte* Restraining Order." *See* RSA 458:16 (2004). One day later, the Derry Family Division granted the motion and issued a restraining order prohibiting the petitioner from having any contact with the respondent or his daughter. On March 23, 2005, the Salem Family Division reissued the order.

In August 2004, the Salem Family Division (*Sadler*, J.) held a two-day hearing for purposes of obtaining the GAL's testimony. Both the petitioner, who appeared *pro se*, and the respondent's counsel questioned her.

In March 2005, the Salem Family Division issued a pretrial conference order scheduling four days of trial beginning April 29, 2005. The court scheduled one day for the respondent, who was represented by counsel, to present evidence; two days for the petitioner, who would appear *pro se*, to present evidence; and three hours for each party on the final day for cross-examination.

On April 29, 2005, the first day of trial, the respondent, through her attorney, examined her five witnesses. After the direct examination of the respondent's first witness, the petitioner requested that he be permitted to conduct his cross-examination. The court denied his request, informing him that time had been scheduled on the fourth day of trial for cross-examination. The petitioner did not cross-examine any of the respondent's witnesses until the scheduled time on the last day of trial.

On June 27, 2005, the court issued its final order and divorce decree. The court granted the respondent's cross-petition for a fault-based divorce "on the grounds that during the marriage [the petitioner] treated her in such a [manner] as to injure her health and endanger her reason." *See* RSA 458:7,

V. The March 23, 2005 restraining order was continued in effect pending further order of the court upon the court's finding that "[t]he Respondent is genuinely in fear for her safety as a result of the acts and credible threats of the Petitioner."

On the issues of visitation and custody, after finding that the respondent was the primary caretaker of the parties' daughter, the court awarded her sole legal and physical custody, and awarded the petitioner supervised visitation rights. The petitioner was ordered to pay the respondent $50 per month as child support.

Finding that the respondent had the ability to pay and the petitioner had the need for alimony, the court awarded the petitioner alimony of $1,300 per month for two years. The court awarded the marital residence to the respondent and equitably divided the parties' remaining assets. As a part of this division, the court ordered that all of the petitioner's firearms and other weapons be sold, with the proceeds being awarded to him.

The petitioner appeals, arguing: (1) the trial court denied him due process by preventing him from cross-examining some of the respondent's witnesses, and not allowing cross-examination until weeks after direct examination; (2) he was denied due process when the court granted non-verified motions without a hearing; (3) the GAL was unqualified and appointed in violation of RSA 458:17-a; (4) the court erred in its findings and rulings of law on the issues of alimony, visitation, division of the assets, continuation of the restraining order, and its fault-finding; and (5) the court erred in ordering the sale of the petitioner's firearms.

The respondent cross-appeals, arguing that the trial court erred in: (1) awarding the petitioner visitation; (2) awarding the petitioner alimony; and (3) dividing the parties' assets.

## II. Issues on Appeal

### A. Due Process

Citing Part I, Article 15 of the New Hampshire Constitution, the petitioner first argues that he was denied procedural due process because: (1) he was prevented from cross-examining some witnesses, and not allowed to cross-examine others until weeks after direct examination; and (2) the court granted the respondent's non-verified motion to reconsider the November 2000 alimony order *nunc pro tunc* without holding a hearing. The petitioner further argues that the trial court violated Superior Court Rule 57 because the respondent's motion was not supported by proper affidavit, and was based upon facts not in evidence.

To trigger a constitutional analysis on appeal, the appealing party must raise the constitutional issue below. *See State v. Dellorfano*, 128 N.H. 628,

632 (1986). A review of the record before us reveals that the petitioner did not raise a constitutional argument before the trial court in response to its denial of his request to cross-examine witnesses immediately following the direct examination. Although the defendant stated that he wished to cross-examine the respondent's first witness "now," when the court informed him that all cross-examinations would take place on the last day of trial, the petitioner acquiesced and said nothing further. *See State v. Porter*, 144 N.H. 96, 100 (1999) (declining to review defendant's argument that he was precluded from cross-examining the victim where defendant "did not object to the trial court's ruling, but rather acquiesced to it"). This single statement "was not sufficient to put anyone on notice that he ... meant to raise a constitutional issue." *Appeal of Bosselait*, 130 N.H. 604, 607 (1988), *cert. denied*, 488 U.S. 1011 (1989); *see also Appeal of Kaplan*, 153 N.H. 296, 301-02 (2006).

The record also reveals that the petitioner never raised a due process argument before the trial court in response to the court's grant of the respondent's motion to reconsider alimony *nunc pro tunc*. Nor is there evidence that the petitioner raised a Superior Court Rule 57 argument before the trial court on this issue. Although the petitioner, who was represented by counsel at this time, filed an objection to the motion, the objection contained no allegations that the respondent's motion was inadequate under the court rules or violated his due process rights. Rather, the objection merely reiterated the petitioner's need for alimony.

As a general rule, "issues must be raised at the earliest possible time, because trial forums should have a full opportunity to come to sound conclusions and to correct claimed errors in the first instance." *Bosselait*, 130 N.H. at 607 (quotation and brackets omitted). As the party appealing this issue, the petitioner has the burden of providing a sufficient record on appeal and demonstrating that he raised his issues in the trial court. *Bean v. Red Oak Prop. Mgmt.*, 151 N.H. 248, 250 (2004). Although the respondent did not raise a preservation argument in her brief or at oral argument, we may nonetheless consider the issue because it is a matter of compliance with our rules regarding appeals. *Id.*

■ While we have our doubts about the procedure used by the trial court here, we decline to consider the petitioner's arguments on these issues because he has failed to demonstrate that he preserved them for our review. *Blagbrough Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 35 (2007); *In the Matter of Hampers & Hampers*, 154 N.H. 275, 287 (2006). Although we recognize that the petitioner was *pro se* during some of the proceedings below, "[w]e see no reason to depart from the general principle that the rules of preservation are not relaxed for a *pro se*"

litigant. *Porter*, 144 N.H. at 100-01; *see also Simpson v. Young*, 153 N.H. 471, 473 (2006); *DeButts v. LaRoche*, 142 N.H. 845, 847 (1998).

### B. Guardian Ad Litem Qualifications

We next address the petitioner's argument that Blake was unqualified to be a GAL as a matter of law. The petitioner argues that pursuant to RSA 458:17-a (2004) (repealed 2005), a GAL is required to be admitted to practice law in New Hampshire.

The petitioner fails to cite any language in RSA 458:17-a that requires a GAL to be a New Hampshire attorney, and we find none. Paragraph IV of the statute states that the court is responsible for providing "[s]tandards and requirements for registration as a guardian ad litem." RSA 458:17-a, IV(a). However, the rules for GAL certification that governed the Family Division contained no requirement that a GAL be a New Hampshire attorney. *See* SYSTEM-WIDE GUARDIAN AD LITEM APPLICATION, CERTIFICATION AND PRACTICE Rule 1.4(c); *see also* FAMILY DIV. R. (DOMESTIC RELATIONS) 15(A) (incorporating the "State-wide guardian ad litem application, certification and practice document" as a rule of the family division). While the Guidelines for Guardians ad Litem prepared by the superior court in 1983 state that a GAL "shall be" an attorney admitted to practice in New Hampshire, *see* GUIDELINES FOR GUARDIANS AD LITEM, par. 1, the guidelines are "not for the purpose of imposing rules or strict procedures," PREFACE TO GUIDELINES FOR GUARDIANS AD LITEM, *supra*, and have not been adopted as rules of the Family Division.

■ Accordingly, we reject the petitioner's argument that because Blake was not a member of the New Hampshire bar, she was "unqualified and appointed in violation of RSA 458:17-a."

### C. Trial Court's Findings and Rulings

#### 1. Alimony

Both parties appeal the trial court's award of alimony to the petitioner. The court awarded the petitioner $1,300 per month for two years, based upon findings that he "does not have sufficient assets or income to support himself," but that he "has sufficient vocational skills to be gainfully employed in or within two years in real estate development, construction and/or the business of purchasing and selling antiques." The petitioner argues that he is disabled due to injuries suffered in a 1988 fall and an automobile accident in 1993, and that the court's finding that he can be gainfully employed in two years is against the weight of the evidence. The respondent argues that: (1) the petitioner failed to prove his need for alimony; (2) the amount of alimony awarded is excessive; and (3) the trial

court failed to adequately consider the petitioner's fault in awarding alimony.

> RSA 458:19, I (Supp. 2005) authorizes the trial court to award alimony if: (1) the party in need lacks sufficient income, property, or both to provide for his or her reasonable needs, considering the style of living to which the parties have become accustomed during the marriage; (2) the payor is able to continue to meet his or her own reasonable needs, considering the style of living to which the parties have become accustomed during the marriage; and (3) the party in need cannot be self-supporting through appropriate employment at a standard of living that meets reasonable needs, or is the custodian of the parties' child, whose condition or circumstances make it appropriate that the custodian not seek employment outside the home.

*Hampers*, 154 N.H. at 283. In determining the amount of alimony, a trial court must consider various factors enumerated in RSA 458:19, IV (2004). Nevertheless, trial courts have broad discretion in awarding alimony. *Marsh v. Marsh*, 123 N.H. 448, 451 (1983). We review the trial court's decision under our unsustainable exercise of discretion standard. *Hampers*, 154 N.H. at 283.

■ The record shows that the court considered the RSA 458:19, IV factors. Specifically, the court stated that it considered the length of the marriage (fourteen years), recognized that there was "conflicting evidence concerning Petitioner's disability and his ability to earn a living," and noted that there was no "current medical evidence concerning the Petitioner's current medical condition." However, the court found that the petitioner had sufficient vocational skills to be gainfully employed within two years. The court found that the respondent had been the sole support for the family since 1991, when the parties were married, and that the petitioner currently "does not have sufficient assets or income to support himself." The court's order also acknowledged the petitioner's behavior throughout the marriage, which supported its finding of a fault-based divorce. This factor, however, does not preclude an alimony award: "In determining the amount of alimony . . . the conduct of the guilty party is not conclusive but is an element to be considered under all the circumstances." *Kibbee v. Kibbee*, 99 N.H. 215, 216 (1954). Additionally, the court denied the petitioner's request for retroactive alimony based upon the amounts already paid by the respondent prior to the final order.

Based upon these factors and the evidence in the record, we cannot say that the trial court unsustainably exercised its discretion by ordering the

respondent to pay alimony to the petitioner for a period of two years. *Hampers*, 154 N.H. at 284.

### 2. *Visitation*

Next, we review the petitioner's argument that the trial court's visitation orders were unsustainable and the respondent's counter-argument that the trial court erred in awarding the petitioner even limited visitation.

In the final decree, the trial court awarded the respondent sole legal and physical custody of the parties' daughter and awarded the petitioner supervised visitation for two hours every other Sunday. The petitioner argues that there was no reasonable basis for the visitation orders since the court found that the petitioner did not present a danger to the parties' daughter. The respondent argues that: (1) visitation with the petitioner will not benefit the parties' daughter and is not in her best interests; (2) the daughter does not wish to see the petitioner; (3) the respondent's right to travel under the New Hampshire Constitution is violated by the visitation order; and (4) the trial court failed to adequately consider the petitioner's behavior during the marriage.

> The trial court has wide discretion in matters involving custody and visitation. That discretion necessarily extends to matters such as assigning weight to evidence and assessing the credibility and demeanor of witnesses. Conflicts in the testimony, questions about the credibility of witnesses and the weight to be given testimony are for the trial court to resolve. Our review is limited to determining whether it clearly appears that the trial court engaged in an unsustainable exercise of discretion.

*In the Matter of Choy & Choy*, 154 N.H. 707, 713 (2007) (citations omitted).

Before issuing its final order in June 2005, the trial judge reviewed the recorded testimony of the GAL, who testified that:

> [r]ight now it would not be in [the child's] best interests to have contact with [the petitioner]. . . . [The petitioner] has a lot of work to do to deal with his own awareness of what this situation . . . [has] done to [the child] as well as his inappropriate communications with [the child] during the visitation times . . . and understanding of where [the child] is emotionally and what her views are . . . . [I]f at any time in the future visitation were considered, . . . [the child's] emotional state and her readiness and her preparedness for that would have to be paramount. . . . I have

not seen any indication that [visitation] would benefit her in any way at this time.

The child's therapist, Kay Edwards, testified that the child had indicated that if she were to see the petitioner, "she would want someone there all of the time" to feel safe. Edwards also testified that given the child's age (thirteen at the time of trial), it would be proper to consider her desires regarding visitation. Dr. Richard Shulik, a psychologist who evaluated all of the parties, testified that the child spoke of the petitioner "with affection" and at one point stated "that she wished that she could see him, but . . . only if he doesn't make trouble."

■ In matters of visitation, the court's overriding concern is the best interests of the child. *In the Matter of R.A. & J.M.*, 153 N.H. 82, 93 (2005). "Although visitation by [a] non-custodial parent is an important right, it is one that must yield to the greatest good of the child." *In the Matter of Lockaby & Smith*, 148 N.H. 462, 465 (2002) (quotation omitted). In making this determination, the trial court may consider, among other things, the desires of the child, the effect visitation will have on the child's emotional well-being, *see Lester v. Lester*, 111 N.H. 117, 119 (1971), and the recommendations of the GAL, *Choy*, 154 N.H. at 714. However, none of these factors is dispositive and the recommendations of a GAL should not be afforded greater presumptive weight than other evidence in the case. *Id.*

■ The trial court made detailed findings and there is sufficient evidence in the record to support its visitation orders. The court considered the testimonies of the GAL, the child's therapist, and the psychologist who evaluated the parties and their daughter. The court found that the respondent was the primary caretaker for the child, that the child is well adjusted and desires to continue living with her mother. The court also found that the petitioner had made threats to the respondent and accepted the psychologist's conclusion that he is "emotionally volatile."

However, the court also found that the petitioner "loves his daughter and desires to resume a relationship with her," and that "[n]o credible evidence was offered . . . that the Petitioner was a threat to his daughter's safety." Based upon these findings and rulings, the court awarded the petitioner supervised visitation.

Based upon the trial court's analysis and the record before us, we cannot say that the trial court engaged in an unsustainable exercise of discretion in its visitation order.

We decline to address the respondent's constitutional claim because she has failed to demonstrate that this issue was preserved for our review. *See Bean*, 151 N.H. at 250.

### 3. Division of the Assets

Both parties challenge the trial court's division of the assets as unsupported by the evidence. The respondent also argues that the trial court failed to adequately consider the fault of the petitioner in dividing them. The trial court awarded the marital residence to the respondent, citing the fault of the petitioner under RSA 458:7, V and further citing concern that the parties' daughter maintain "a stable living environment" in the marital home. The court then ruled that "an equitable division of the parties' remaining assets is appropriate."

██ "RSA 458:16-a, II creates a presumption that equal distribution of marital property is equitable. Absent special circumstances, the court must make the distribution as equal as possible." *Hampers*, 154 N.H. at 285 (quotation and citation omitted). The statute enumerates various factors for the court to consider, such as the length of the marriage, the ability of the parties to provide for their own needs, the needs of the custodial parent, the contribution of each party during the marriage, retirement accounts, and the fault of either party. *Id.*; RSA 458:16-a, II.

> Additionally, the court may consider any other factor it deems relevant in equitably distributing the parties' assets. RSA 458:16-a, II(o). A trial court is not precluded, however, from awarding a particular asset in its entirety to one party.
>
> As we afford trial courts broad discretion in determining matters of property distribution in fashioning a final divorce decree, we will not overturn the trial court's decision absent an unsustainable exercise of discretion. If the court's findings can reasonably be made on the evidence presented, they will stand.

*Hampers*, 154 N.H. at 285 (quotations, citations and brackets omitted). "[I]f the court concludes that an unequal distribution of property is warranted, it should state its reasons and make specific findings and rulings supporting its decision." *Bursey v. Bursey*, 145 N.H. 283, 286 (2000) (quotation omitted); *see* RSA 458:16-a, IV (2004).

█ The petitioner argues that the trial court erred when it relied upon fault grounds to award the marital home to the respondent. Under RSA 458:16-a, II(l), the trial court may order an unequal distribution of assets if it finds that "[t]he fault of either party as specified in RSA 458:7 . . . caused the breakdown of the marriage and: (1) Caused substantial physical or

mental pain and suffering; or (2) Resulted in substantial economic loss to the marital estate or the injured party." The trial court found that the petitioner's fault caused the irremediable breakdown of the parties' marriage and caused the respondent to suffer "significant emotional distress." As there is support in the record for these findings, we uphold them and hold that the trial court did not err when it relied upon fault grounds to award the marital home to the respondent. In light of this conclusion, we need not address the petitioner's alternative assertion that there was no evidence to support a finding that his treatment of the respondent resulted in substantial economic loss to her or to the marital estate.

The petitioner also argues that the court unequally divided the parties' remaining assets by awarding the respondent "her entire retirement account, which gained well over $90,000.00 during the marriage." The respondent counters that the assets were divided unequally in favor of the petitioner, considering a $48,000 debt she has paid off, which includes the parties' joint debt as well as debt accrued by the petitioner under the respondent's name, and the advances the petitioner has received during the litigation.

The respondent also argues that the court gave inadequate weight to the petitioner's fault in dividing the parties' assets. The trial court found that after the award of the marital home to the respondent, an equitable division of the parties' remaining assets was proper in light of the evidence before it.

■ Given the unsustainable exercise of discretion standard we must apply, the appealing party must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his or her case. *State v. Lambert*, 147 N.H. 295, 296 (2001). The record before us, however, does not contain account records, property assessments or any other form of valuation for the assets in dispute. Due to the absence of evidence that clearly shows the asset division was inequitable, neither party has demonstrated on appeal that the trial court's ruling was clearly unreasonable. *See Bean*, 151 N.H. at 250; *Lambert*, 147 N.H. at 296.

■ The respondent further argues that the court erred in failing to reaffirm a previous order directing that the GAL fees be paid from the parties' joint funds, which resulted in the respondent shouldering this entire amount and contributed to the inequitable asset distribution. We disagree. In its final order, the court ordered that the respondent pay the GAL expenses, and took this into account when denying the petitioner's request for retroactive alimony. We cannot say, therefore, based upon the record before us, that the trial court's ruling on this issue was clearly

unreasonable. Accordingly, we affirm the remainder of the court's order dividing the parties' assets.

### 4. Continuation of the Restraining Order

We next address whether the trial court's continuation of the restraining order was unsupported by the evidence. In its final order, the trial court incorporated the restraining order issued in March 2005 and continued it pending further order of the court.

The petitioner argues that after the July 2000 incident, there was no contact to warrant any restraint. The respondent counters that the court justifiably found that a present threat exists. Although no statute is cited in the order, on appeal, both parties presume it was issued under RSA 458:16. We proceed, therefore, under the same assumption.

RSA 458:16 provides, in pertinent part:

> I. After the filing of a petition for divorce, . . . the superior court may issue orders with such conditions and limitations as the court deems just which may, at the discretion of the court, be made on a temporary or permanent basis. . . . Said orders may be to the following effect:
>
> (a) Directing any party to refrain from abusing or interfering in any way with the person or liberty of the other party.
>
> (b) Enjoining any party from entering the premises wherein the other party resides upon a showing that physical or emotional harm would otherwise result.
>
> . . . .
>
> (d) Enjoining any party from harassing, intimidating or threatening the other party . . . .

RSA 458:16, I.

The trial court found that "[c]redible evidence was . . . offered at trial that on July 14, 2000 the Petitioner physically assaulted the Respondent." The court further found that "[t]he Respondent is genuinely in fear for her safety as a result of the acts and credible threats of the Petitioner," and that the petitioner made additional threats to the respondent after the July 2000 incident.

At trial, the respondent testified to these threats and her fear of the petitioner. Dr. Shulik also testified that he "had some concerns as to whether [the petitioner] was trying to frighten his wife," that the petitioner "did not accept" the separation, and that the petitioner had admitted to him that he had violated a previous restraining order.

▇ The trial court is in the best position to assess the credibility of witnesses and weigh the evidence before it. *See Choy*, 154 N.H. at 713. A review of the record reveals that the trial court reasonably could have found that there was a continuing need for a restraining order. We cannot say that the trial court engaged in an unsustainable exercise of discretion.

### 5. *Fault Grounds for Divorce*

We next address the petitioner's argument that the trial court's "finding of fault grounds was against the clear weight of the evidence." The petitioner argues that "nothing happened, until the date of the parties' separation [in July 2000]," and that there was "no further aggression thereafter." Whether the irremediable breakdown of the marriage was caused by irreconcilable differences or the petitioner's fault was a factual question for the trial court. *Hampers*, 154 N.H. at 279. We will affirm the trial court's factual findings unless the evidence does not support them or they are legally erroneous. *Id.*

The trial court found that "the Respondent has proved, by a preponderance of the evidence, that the Petitioner's treatment of the Respondent during the course of the parties' marriage constitutes treatment which has endangered the Respondent's health and reason within the meaning of RSA 458:7[,] V."

▇ RSA 458:7 provides, in pertinent part, that the trial court shall grant a divorce "in favor of the innocent party . . . [w]hen either party has so treated the other as seriously to injure health or endanger reason." RSA 458:7, V. The statute does not require proof of conduct that would have affected an average or reasonable person, but only that the health or reason of the complaining spouse was actually affected. *In the Matter of Gronvaldt & Gronvaldt*, 150 N.H. 551, 553 (2004).

In its narrative order, the trial court found that the following conduct endangered the respondent's health and reason:

> [T]he Petitioner, during the parties' marriage, was possessive and controlling of the Respondent. . . .
> . . . The Petitioner restricted the Respondent's freedom by isolating her from family and friends; forbidding her to talk with neighbors and parents of [the child's] schoolmates; . . . and ordering her not to speak with anyone at church. The Petitioner enforced isolation on the Respondent by threatening to punish [the parties' child] for the Respondent's "wrongdoing". When the Petitioner was angry with the Respondent, he disabled her car or took her keys to prevent her from going to work or from going out. On July 14, 2000, the Petitioner became enraged that the

Respondent was taking [the parties' child] to a friend's home. He began screaming, disconnected the telephones, barricaded doorways with his body, grabbed the Respondent and [the child] so they could not leave the parties['] home, pushed the Respondent and [the child] into a door and against a wall, causing both the Respondent and [the child] to be physically injured. Subsequent to the issuance of the restraining order, the Petitioner threatened the Respondent by telling her "that there are going to be some Sicilian neckties around here." . . . When the Petitioner was angry with the Respondent, he would sit inside the marital residence and shoot at targets in the back yard. The Respondent was frightened of the Petitioner throughout the marriage and feared that he was capable of killing her. The actions of the Petitioner, during the parties' marriage, caused the Respondent significant emotional distress, causing her to seek the assistance of a Pastoral Counselor.

Additionally, in granting the parties' specific requests for findings, the court found that: (1) the petitioner denigrated, belittled and humiliated the respondent and called her degrading names; (2) the petitioner cut off the respondent financially when he was angry with her; and (3) without the respondent's knowledge and permission, the petitioner had the respondent's mail diverted to his post office box in Epsom.

 All of these findings have support in the record, including the respondent's testimony and that of a psychologist. Among other things, the psychologist testified that the petitioner was "emotionally volatile." The trial judge was in the best position to evaluate the evidence, measure its persuasiveness and assess the credibility of witnesses. *Id.* at 554. Because the record supports the trial court's findings, we find no error in its decision to grant a divorce on the ground that the petitioner so treated the respondent as seriously to injure her health or endanger her reason. *Id.*

### D. Firearms

#### 1. RSA 458:16 and the Right to Bear Arms

Next, we address the petitioner's argument that the trial court did not have authority under RSA 458:16 to deprive him of his firearms and that such deprivation violated his right to bear arms under the Federal Constitution and Part I, Article 2-a of the New Hampshire Constitution.

The trial court's final order continued the restraining order issued in March 2005. The March 2005 order stated:

The Court, after having received Offers of Proof by counsel for the Respondent and by the Petitioner, rules and finds that:

(a) The Petitioner represents a credible threat to the physical safety of the Respondent.

. . . .

Accordingly, pending final hearing, [the Petitioner]:

(a) Is restrained from interfering with the person or liberty of [the Respondent], or [the parties' daughter].

. . .

(e) Shall not make verbal or non-verbal threats to [the Respondent] or [the parties' daughter].

The restraining order also ordered the petitioner to relinquish all firearms and deadly weapons and prohibited him from "purchasing or obtaining any firearms . . . during the pendency of this Order." The order did not cite an authorizing statute and did not contain an expiration date.

The petitioner argues that the restraining order "appears only to be an RSA 458:16 order" as opposed to an RSA chapter 173-B order. A restraining order issued pursuant to RSA chapter 173-B must order the defendant to relinquish his firearms for the duration of the order. RSA 173-B:5, I. RSA 458:16, however, provides no such explicit direction, although that statute does provide that "the superior court may issue orders with such conditions and limitations as the court deems just." RSA 458:16, I. The petitioner argues that "there is no authority" under RSA 458:16 for the dispossession of firearms.

We find, however, that the petitioner is bound by federal law. Title 18 U.S.C. § 922(g) (2000) provides, in pertinent part:

It shall be unlawful for any person—

. . .

(8) who is subject to a court order that—

(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that

would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; . . .

to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g).

As used in this provision, "[t]he term 'intimate partner' means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person." 18 U.S.C. § 921(a)(32) (2000).

 The March 2005 restraining order was issued by the trial court after having received offers of proof from both parties. This order was continued in the court's final divorce order, which was preceded by four days of testimony during which the petitioner fully participated. Further, the order prohibits the petitioner from making "verbal or non-verbal threats" to the respondent or the parties' daughter. Finally, the order specifically states that "[t]he Petitioner represents a credible threat to the physical safety of the Respondent." As a matter of law, therefore, 18 U.S.C. § 922(g)(8) prohibits the petitioner from possessing firearms and ammunition during the pendency of the restraining order. *See State v. S.A.*, 675 A.2d 678, 684 (N.J. Super. 1996). Accordingly, the trial court was within its discretion to prohibit the petitioner from possessing firearms since 18 U.S.C. § 922(g)(8) requires such a result.

We also find that the petitioner failed to raise his constitutional arguments in a manner that would have afforded the trial court the opportunity to consider them. *State v. Howe*, 145 N.H. 41, 43 (2000). The record before us is devoid of any mention of the Second Amendment to the Federal Constitution or Part I, Article 2-a of the New Hampshire Constitution. The petitioner never raised his right to bear arms during trial and the record does not contain a motion to reconsider filed by the petitioner which raises this issue. Because we will not review on appeal constitutional issues not presented below, we decline to review the constitutional dimension of the petitioner's arguments. *Id.*

## 2. RSA 458:16-a

Finally, we address whether the trial court properly ordered the petitioner to sell his firearms. In the final divorce order, the trial court ordered "[a]ll of [the petitioner's] firearms and other weapons shall be sold forthwith, and the proceeds thereof shall be awarded to [the petitioner]." The petitioner argues that under RSA 458:16-a, the trial court is authorized to distribute marital property, but cannot "order a sale . . . just for the sake of the sale." We agree.

In matters of statutory interpretation, we are the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole. *State v. MacMillan*, 152 N.H. 67, 70 (2005). When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. *In the Matter of Beal & Beal*, 153 N.H. 349, 350 (2006). The plain language of RSA 458:16-a authorizes trial courts to distribute marital property between the parties. *Id.* The trial court's order requiring the sale of the firearms, however, was not for purposes of dividing the proceeds between the parties. *See Hazen v. Hazen*, 122 N.H. 836, 838 (1982) (master ordered sale of marital residence with proceeds divided between the parties). Instead, the trial court awarded the proceeds in their entirety to the petitioner. This is beyond the scope of the trial court's authority under RSA 458:16-a. *Cf. Beal*, 153 N.H. at 350 (holding trial court cannot order sale of assets to pay creditors). In so holding, however, we do not foreclose any other disposition of the firearms, necessary for the proper division of the assets, consistent with this opinion and state and federal law. *See* 18 U.S.C. § 922(g). Accordingly, we reverse and remand the portion of the trial court's order requiring the petitioner to sell the firearms.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.