# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2018-0173, <u>In the Matter of Gina Bundza and Brian Bundza</u>, the court on April 24, 2019, issued the following order:**

Having considered the parties' briefs and the record submitted on appeal, we conclude that a formal written opinion is unnecessary in this case. The respondent, Brian Bundza, appeals an order of the Circuit Court (<u>Alfano</u>, J.) awarding the petitioner, Gina Williams, formerly Gina Bundza, sole decision-making and residential responsibilities for the parties' minor child, ordering, among other things, that the father have no contact with the child, requiring that the father pay all attorney's fees and other litigation expenses, and forbidding the father from posting anything about the mother or the child on social media. The father argues that the order must be vacated for several reasons including that the court did not provide constitutionally adequate notice. We vacate and remand.

The following facts were found by the trial court or are supported by the record. The parties have one child born in January 2009. The parties divorced in August 2011. Their initial parenting plan awarded them joint decision-making responsibility and equal residential responsibility.

Before the parties divorced, the child's pediatrician reported to the New Hampshire Division for Children, Youth and Families (DCYF) that the mother suspected that the child had been sexually abused at a daycare facility, and DCYF reported the same to the Rochester Police Department. The police investigated and concluded that no "foul play or any type of crimes" had been committed against the child.

In January 2013, the court granted the mother's ex parte motion seeking "full parental rights and responsibilities" after the father was arrested for aggravated assault. In March 2014, the mother filed a petition to change the parenting plan, requesting "sole rights and responsibilities" because she was concerned that the child "could witness or experience domestic violence" while with the father. In August 2014, before the court had ruled on the mother's motion to modify, the father was incarcerated due to imposition of a suspended sentence. At that time, he also faced new misdemeanor charges of simple assault and stalking. As a result of his incarceration and pending charges, the Trial Court (<u>Patten</u>, J.) temporarily suspended the father's parenting time, stating, however, that it "anticipates restoring his parenting time in some capacity . . . as soon as his circumstances are stabilized."

In October 2014, after the child disclosed in therapy that the father had perpetrated sexual abuse, a medical doctor examined the child and found physical evidence of abuse. The doctor could not determine whether the father, or someone else, committed the abuse.

From January 2015 until March 2016, the father had weekly, supervised parenting time at a Parenting Support Center. In March 2016, the court temporarily suspended his parenting time, stating that "[w]hile it is far from clear that father committed the abuse, something clearly happened to [the child] that is causing [the child] distress." It reasoned that if the "father sexually abused [the child], their continued 'visits' could indeed be causing [the child] terrible psychological and emotional harm. If father did not abuse [the child], a temporary suspension of their 'visits,' while unfortunate, should cause no lasting harm to their relationship." The court ordered a "final hearing on the parenting issues in approximately 90 days."

In June 2016, after DCYF closed its assessment in the case as "Unfounded," the court held a "final hearing on mother's Motion to Modify." The mother argued that the parenting plan should be modified pursuant to RSA 461-A:11, I(c), which allows a court to modify a permanent order concerning parental rights and responsibilities if "the court finds by clear and convincing evidence that the child's present environment is detrimental to the child's physical, mental, or emotional health, and the advantage to the child of modifying the order outweighs the harm likely to be caused by a change in environment." RSA 461-A:11, I(c) (2018); see also Black's Law Dictionary 674 (10th ed. 2014) (defining "clear and convincing evidence" as "[e]vidence indicating that the thing to be proved is highly probable or reasonably certain"). Following the hearing, in July 2016, the Trial Court (Foley, J.) approved a detailed order recommended by a Marital Master (Cross, M.) that set forth the evidence in the case, some of which suggested that the father had sexually abused the child, and some of which suggested that the mother may have influenced the child to "'remember'" the father's abuse. The court concluded that, although it found credible and convincing evidence that the child had been sexually abused by someone, the evidence fell "short of proving it highly probable or reasonably certain" that the father was the perpetrator. The court observed that if it prevented the child from seeing the father without sufficient evidence that the father had perpetrated the abuse, the father would have "lost his parental rights without the due process that attaches to a child protection case or criminal prosecution. In effect, his parental rights would be suspended even though he has not been charged with or convicted of . . . abuse." The court then awarded the father weekly, supervised visitation time of gradually increasing length, and ordered a future review hearing with the "hope . . . that a longer-term parenting schedule can be developed that will help end this active litigation."

In December 2016, the Trial Court (<u>Maloney</u>, J.) stated after a review hearing that it was "not convinced" that visitation presented a "continuing danger" to the child and ordered continued weekly, supervised parenting time between the father and the child.

In December 2017, the Trial Court, (<u>Alfano</u>, J.) approved an order recommended by a Marital Master (<u>Cross</u>, M.) concluding that the child's "best interests require the 'normalization' of [a] relationship with father." At that time, the court had a report from Dr. Mart, a forensic psychologist, that opined that the child's statements suggesting abuse by the father "are the product of suggestive questioning and techniques by [the] mother and by [the child's therapist]." The report stated that the child "has no independent recollection of being abused by [the] father, and the investigations of possible abuse were not triggered by a disclosure by [the child] but were the product of a combination of confirmatory bias on the part of [the child's mother] and [the therapist] combined with suggestive questions, statements and techniques." Mart recommended that "any limitations on [the father's] contact with [the child] which [are] predicated on his having sexually abused [the child] should be removed, and decisions regarding custodial time should be made on the basis of parenting ability and parent-child fit." The guardian ad litem (GAL) supported Mart's recommendation that the father's parenting time no longer be supervised and that the parenting schedule be based on the parties' and the child's schedules and the parties' respective parenting abilities. The court concluded that Mart's "evaluation was comprehensive, well-reasoned, and consistent with the evidence the court has heard in the past several hearings." The court then restored the father's joint decision-making authority, temporarily awarded him increased parenting time, and ordered that a final hearing be scheduled. Days later, the court sent the parties a written notice stating that a final hearing on "BF PETITION #123" would take place on February 14, 2018. Prior to the hearing, both parents and the GAL developed proposed parenting plans requesting joint decision-making and approximately equal residential responsibility.

On February 14, 2018, Judge Alfano started the hearing, at which both parties were self-represented, by asking the mother to explain "what you want me to order and why?" The mother answered that she had a proposed parenting plan and that she was "asking for equal time." The court responded:

> [L]et me back up for a minute. And I want to be clear about one thing. We're starting from scratch here. . . . [S]o if I believe your allegations, I'm not bound by anything else. . . . I can award you what you ask for, sole. Okay? So if you want sole, you should ask for sole. . . . [I]f you think that's in [the child's] best interest, we're not in the middle of a case. We're really at the beginning because this is a final hearing; does that make[] sense?

The mother replied, "I do think that sole decision making would [be] in [the child's] best interests. . . . However, I'm understanding of the fact that everybody wants to move forward and for [the child's] sake, it might be best that we have shared." The court asked if the mother believed that the child was sexually molested by the father, and the mother answered: "All of the information points to that." The court responded: "Yep. So if that's your conclusion, do you want sole residential and sole decision making?" The mother replied: "I think it would be best for [the child] for me to make the decisions."

During the hearing, the GAL objected to the mother's characterization of a portion of the GAL's report as "pure conjecture"; however, the court overruled the objection on the basis that the GAL was not a party to the case because the legislature had changed the governing statute. See RSA 461-A:16 (2018) (amended 2018). The GAL later testified as a witness. During the father's testimony, the court questioned him about his history of domestic violence against third parties.

Following the hearing, the court issued the order that is now on appeal. The court found "by a preponderance of the evidence, that Father has likely sexually abused [the child] on more than one occasion" and that "Father had done significant harm . . . by sexually abusing [the child] and then denying that he did so." The court concluded that the GAL's recommendation that the parents share decision making and residential responsibilities was not in the child's best interest. The court also rejected Mart's report for failing to meet the standards required for an expert report under RSA 516:29-a. See RSA 516:29-a (2007). The court found it troubling that the report did not mention a February 2015 letter from the child's therapist detailing the child's accusation that the father had perpetrated sexual abuse.

Based upon its findings, the court awarded the mother sole decision-making and residential responsibilities and ordered that the father "have no contact with Mother or . . . child directly or indirectly." It ruled that "when and if" the child decides to have contact with the father, the mother should file a motion with the court, but "[o]therwise, there shall be no contact between Father and [the child]." The court also ordered that the father have no contact with the child's school, teachers, doctors, or counselors and ordered him not to "post anything about [the child] or [the] Mother on social media." The court reallocated all past, present, and future GAL expenses to the father. It also awarded the mother attorney's fees on the grounds that "this litigation was the result of Father's bad faith and unreasonable conduct." The court denied both the father's and the GAL's motions to reconsider. This appeal followed.

On appeal, the father argues that the trial court made several errors that require us to vacate the February 14, 2018 order. He argues that "[t]he issues on appeal primarily stem from the Court's improper interference with the

4

parties' agreement to share decision making and equal or approximately equal parenting time." He asserts that "despite a standing Order and agreement, the Court from the bench improperly influenced [the mother] into seeking sole decision making and sole residential responsibility." He contends that "[t]his abuse of process turned the agreement of the parties on its axis without notice to anyone, including the Guardian ad Litem" and that the "result effectively terminated [his] parental rights."

First, the father argues that the trial court violated his right to a properly noticed hearing when it awarded sole decision-making and residential responsibility to the mother on the basis that he had sexually abused his child. He asserts that, based on previous orders from the court and the parties' proposed parenting plans, he "had no notice, never mind adequate notice, that the Court would consider sole decision making at the February 14, 2018 hearing." He further contends that the trial court was precluded from considering allegations that the father had sexually abused the child because that issue had been previously — and finally — litigated more than 18 months earlier at the June 2016 hearing, after which "the only issue for the Court's consideration, was the detailed and anticipated expansion of the [father's] parenting time."

Next, he argues that the court unsustainably exercised its discretion, and exceeded its statutory authority, when it modified the parenting plan in the absence of sufficient evidence that any of the circumstances set forth in RSA 461-A:11, I exists. See RSA 461-A:11, I. He asserts that the "only 'evidence' that the court had to support" its order "was the evidence that the court created," and that "[a]side from the Court's manufactured and erroneous adjudication of abuse, there are no facts or testimony in evidence to support the award of sole residential and decision making to [the mother]."

Third, the father asserts that the trial court erred as a matter of law when, on the basis that the legislature had "changed the statute," it prevented the GAL from fully participating in the hearing, and denied the GAL's motion for reconsideration. He asserts that, because the legislature did not pass the new statute until June 2018, and the revised law did not go into effect until January 2019, see Laws 2018, 230:1, the trial court committed "judicial error, which, at the very least demonstrates a substantive misunderstanding of the pendency of legislation and may even amount to a blatant disregard for due process."

Fourth, the father argues that the trial court unsustainably exercised its discretion in ordering the father to pay attorney's fees, GAL fees, and other litigation expenses. He asserts that, because the mother had not requested that the father pay her attorney's fees and litigation expenses, and because the hearing notice did not suggest that the issue would be litigated, the court's allocation of fees must be vacated. He further contends that there are no facts

in evidence to support the trial court's conclusion that the father acted in "bad faith."

Fifth, the father asserts that the trial court violated his "most basic rights to due process" because it effectively terminated his parental rights without applying the "procedural and burden-of-proof protections" required by the State and Federal Constitutions and New Hampshire statute. See N.H. CONST. pt. I, art 2; U.S. CONST. amend XIV; RSA ch. 170-C (2014). He contends that "[t]he risk of erroneous deprivation of [his] constitutionally protected interest was exacerbated by the fact that the Court overlooked the parties' agreement and forced [him] to carry on with a hearing on issues that were not appropriately before the Court."

Sixth, the father argues that the trial court erred when it considered his domestic violence history, which did not involve the mother or the child, because New Hampshire law does not permit consideration of "abuse or behavior that has no impact on the relationship between the child and parent." See RSA 461-A:6, I(j) (2018) (stating that the court should be guided by the best interests of the child, which include "[a]ny evidence of abuse, as defined in RSA 173-B:1, I or RSA 169-C:3, II, and the impact of the abuse on the child and on the relationship between the child and the abusing parent").

Finally, the father argues that the trial court lacked authority to restrict his ability to make statements on social media. He asserts that there was no "evidence or testimony that social media had been used in a way that was harmful to the child." He contends that the prohibition constitutes an unconstitutional "prior restraint on free speech" because it prohibits him "from speaking in the modern public square" and "forecloses his ability to engage in the legitimate exercise of First Amendment Rights." See N.H. CONST. pt. I, art. 22; U.S. CONST. amend. I.

When determining matters of parental rights and responsibilities, a trial court's overriding concern is the best interest of the child. In the Matter of Miller & Todd, 161 N.H. 630, 640 (2011). The trial court has wide discretion in matters involving the allocation of parental rights and responsibilities. Id. We will not overturn a trial court's modification of an order regarding parental rights and responsibilities unless it clearly appears that the court unsustainably exercised its discretion. In the Matter of Muchmore & Jaycox, 159 N.H. 470, 472 (2009). We consider only whether the record establishes an objective basis sufficient to sustain the discretionary judgment made, and we will not disturb the trial court's determination if it could reasonably have been made. In the Matter of Kurowski & Kurowski, 161 N.H. 578, 585 (2011). The trial court's discretion necessarily extends to matters such as assigning weight to evidence and assessing the credibility and demeanor of witnesses. Id. Conflicts in the testimony, questions about the credibility of witnesses, and the weight assigned to testimony are matters for the trial court to resolve because

resolution of the best interests of a child depends to a large extent upon the firsthand assessment of the credibility of witnesses.  Id.  Findings of the trial court are binding upon this court if supported by the evidence.  Id.  To the extent an appealing party argues that the trial court committed error involving questions of law, we review such issues de novo.  Id.

We first consider the father's notice arguments.  He asserts that based on "the hearing notice, the prior orders and the parties' agreement, a reasonable person would not have been fairly informed" that the February 14, 2018 hearing would include adjudication of whether the mother should receive sole decision-making or sole residential responsibility, adjudication of whether the father had sexually abused the child, and allocation of attorney's fees and other litigation expenses.  He contends that after the July 2016 order, "the only issue for the Court's consideration, was the detailed and anticipated expansion of the [father's] parenting time."  He argues that had he known that

> the Court would ignore prior orders and that the hearing might result in a virtual abrogation of his parental rights due to erroneous findings of abuse, he would have prepared witnesses and evidence regarding issues such as his character.  He would have subpoenaed expert witnesses regarding his non-involvement in the alleged sexual abuse, brought copies of the Orders relative to the prior adjudication that the Court clearly overlooked, and brought documentation of the satisfactory development of the child during the times he was engaged as a parent.  Whatever the nature of the evidence he might have produced, he would have been prepared to contest the issue.

He asserts that the trial court's "abuse of process" violated his due process rights because it "turned the agreement of the parties on its axis without notice to anyone, including the Guardian ad Litem."

The mother counters with two arguments: 1) that the trial court actually premised its order on its determination that the father was not credible, not on its conclusion that the father sexually abused the child; and, 2) that the notice the father received was adequate because he received "actual notice of the Final Hearing in December 2017" and had sixty days to prepare.  She further appears to assert that since 2013, when the court first ordered that the parenting plan be changed, the father was on notice that the parenting plan may be altered.

We disagree with the mother's interpretation of the trial court order.  See In the Matter of Salesky & Salesky, 157 N.H. 698, 702 (2008) (explaining that the interpretation of a trial court order presents a question of law for this court, which we review de novo).  We agree that the court concluded that the father's testimony was not credible and that the trial court has discretion to assess the

credibility and demeanor of witnesses.  See Kurowski, 161 N.H. at 585.  However, the trial court premised its order, at least in large part, on its conclusion "that by a preponderance of the evidence, that Father has likely sexually abused [the child] on more than one occasion.  For purposes of this matter, it is clear that [the child] was sexually abused by [the] Father."  Accordingly, we must analyze whether the father received constitutionally adequate notice that the issue of whether he had sexually abused the child years earlier would be relitigated at the February 14, 2018 hearing.

We address the father's due process claim under the State Constitution and rely upon federal law only to aid our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).  Under both Part I, Article 15 of the New Hampshire Constitution and the Fourteenth Amendment of the Federal Constitution, "an elementary and fundamental requirement of due process is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Douglas v. Douglas, 143 N.H. 419, 423 (1999) (quotation omitted).  Reasonable notice means notice that is "reasonably calculated to give the [litigant] actual notice of the issue and the hearing."  Duclos v. Duclos, 134 N.H. 42, 44-45 (1991) (quotation omitted).

The actual notice that the Circuit Court sent the parties in December 2017 stated that a final hearing on "BF PETITION #123" would take place on February 14, 2018.  It is our understanding, which it appears the parties share, that "BF PETITION #123" is the mother's March 2014 petition to change the parenting plan due to her concerns that the child would be exposed to domestic violence.  That petition did not allege that the father had sexually abused his child; however, it is uncontested that after that petition was filed, new facts and legal issues, including allegations that the father had abused his child, entered the case.  However, it is also uncontested that many of those issues, including whether the father had sexually abused the child, had been litigated during the pendency of the case.  Indeed, in July 2016, after a "final hearing," the court approved a detailed order recommended by the marital master which concluded that "[t]he evidence, on balance, . . . falls short of proving it highly probable or reasonably certain that father sexually abused [the child]."  The court then awarded the father parenting time and observed that it "hope[d] . . . that a longer-term parenting schedule can be developed that would help end this active litigation."

In December 2017, just two months before the final hearing, the trial court found that the child's "best interests require the 'normalization' of [the child's] relationship with father."  At that time, the court found that the forensic psychologist's evaluation was "comprehensive, well-reasoned, and consistent with the evidence the court has heard in the past several hearings."  The court then restored the father's joint decision-making, and temporarily awarded him overnight parenting time, including a week-long period when the

mother was out of the country. Both parents and the GAL entered the hearing on February 14, 2018 with proposed parenting plans that provided for joint decision-making, and approximately equal residential responsibility.

We agree with the father that — based on the hearing notice, the prior orders, and the parties' agreement — a reasonable person in the father's position would not have expected that the issue of whether he had sexually abused his child would be litigated at the February 14, 2018 hearing. We hold, therefore, that the notice the father received was inadequate to fairly inform him of the issues to be adjudicated at the hearing in violation of Part I, Article 15 of the New Hampshire Constitution. The Federal Constitution offers the father at least as much protection as does the State Constitution under these circumstances. See Douglas, 143 N.H. at 423-24. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

Therefore, because the parties lacked adequate notice that the issue of whether the father had sexually abused the child would be relitigated at the hearing, we conclude that the trial court order must be vacated. Having so concluded, we need not address the father's additional appellate arguments, many of which raise significant questions of law that warrant careful consideration.

On remand, the court should consider whether the July 2016 order, which concluded after a "final hearing" that "[t]he evidence on balance . . . falls short of proving it highly probable or reasonably certain that father sexually abused [the child]," precludes relitigation of this issue. In addition, on remand the court should assess the relevance of the father's domestic violence history given the "best interests" factors set forth in RSA 461-A:6, and address whether any of the circumstances set forth in RSA 461-A:11 are present to justify modification of parental rights and responsibilities. See RSA 461-A:11. The court may also want to analyze the ramifications in this case, if any, of the amendment to RSA 461-A:16, the Guardian ad Litem statute, which became effective on January 1, 2019. See Laws 2018, 230:1.

In 2016, the court observed that this "litigation has been contentious and nearly continuous for 6 of the 7 years [the child] has been alive." We note that the case has become even more complicated in the subsequent three years. There have been three GALs appointed to date, and the case includes allegations of abuse, alienation, and domestic violence. This is a high conflict case. Additionally, the father has been prevented from having any contact with his child for over a year while this appeal has been pending. Because this case presents issues of the type appropriate for reassignment to the Family Division Complex Case Docket, see https://www.courts.state.nh.us/fdpp/complexcasedocket/ComplexFamilyDocketFAQ.pdf, the Administrative Judge of the Circuit Court should carefully

9

assess whether this case should be reassigned to that docket.  <u>See</u> RSA 490-F:2 (Supp. 2018).

<u>Vacated and remanded</u>.

LYNN, C.J., and HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Eileen Fox,**
**Clerk**
