Portsmouth Family Division
No. 2009-806

## IN THE MATTER OF JAMES J. MILLER AND JANET S. TODD

Argued: November 17, 2010
Opinion Issued: March 31, 2011

*Law Office of Joshua L. Gordon,* of Concord (*Joshua L. Gordon* on the brief and orally), for the petitioner.

*John P. Carr,* of Hingham, Massachusetts, and *Elizabeth B. Olcott,* of Concord, on the brief, and *Mr. Carr* orally, for the respondent.

HICKS, J. The petitioner, James J. Miller, currently a resident of New York, appeals an order of the Portsmouth Family Division (*DeVries,* J.), recommended by the Master (*Cross,* M.), requiring the parties' two minor

daughters to continue to live primarily with the respondent, Janet S. Todd, in New Hampshire. We vacate and remand.

We have reviewed the extensive record in this case and set forth the facts most relevant to the issues on appeal. Miller and Todd met in 1999 over the internet and established a relationship. At that time, Miller lived in Michigan and Todd lived in New Hampshire. Although they never married, their relationship produced two daughters, Laurel born in 2002 and Lindsay born in 2003. During 2002 and 2003, the parties spent some time living together in Michigan, Todd and the children spent some time alone in New Hampshire living with Todd's parents, and the parties all spent some time together at Todd's parents' house in New Hampshire.

Toward the end of 2003, the parties' relationship broke down. On December 23, 2003, Miller obtained an *ex parte* order in the circuit court in Michigan granting him sole temporary legal and physical custody of his daughters. That same day, Todd took the children to her parents' home in Hampton, New Hampshire. On January 6, 2004, Todd was served with the Michigan custody order. On January 15, the Rockingham County Superior Court, in response to Miller's petition for enforcement of the Michigan custody decree, ordered Todd to appear at a hearing and on January 26, the trial court ordered Todd to bring the children to Miller within twenty-four hours for the purpose of transferring custody to him.

Sometime in January, Todd's mother told her that, four months earlier, she saw Miller molest Laurel by inserting his forefinger into her. On January 27, on the advice of her attorney, Todd took the children to the emergency department at Exeter Hospital and requested a "well baby check." The physician's report states: "[P]atient here for well child check-up; told by Lawyer to have evaluated for custody issue." There is no evidence in the record that Todd notified the hospital staff of any concerns regarding sexual abuse. The physical exam indicated the children's condition was good. Todd then transferred the children to Miller's custody.

On February 5, 2004, a report was filed with the Family Independence Agency of Michigan, Child Protective Services, alleging that

> maternal grandparents recalled an incident that occurred in New Hampshire between 10/03/03 and 10/05/03 when father was rubbing diaper cream on Laurel because she had a diaper rash. Maternal grandmother states she did not have [a] diaper rash. Maternal grandmother stated father inserted his fore-finger inside of Laurel. This was never reported to anyone.

The agency investigated the report, including having pelvic examinations of both children administered. No indications of sexual abuse of either child were found and the investigation was closed.

In November 2004, the Rockingham County Superior Court issued a temporary decree awarding the parties joint legal custody of the children. In that order, the trial court questioned the credibility of both parties. Regarding Todd, the court found "most troubling" the allegations of sexual abuse raised by her. As the court stated, "It is simply far too convenient to believe the testimony put forth by [Todd]: that her mother [chose] not to reveal the allegations of [Miller's] alleged sexual assault until custody of the minor children was awarded to [Miller]." The court noted that neither party "appears to care to whom they lie so long as they achieve favorable results."

In June 2005, Todd's father reported to the Hampton police that while he was lying in bed with Lindsay and Laurel watching a movie, Laurel tried to "straddle" him on his chest and stated, "I'm f------ you." When the grandfather asked Laurel where she heard that she said nothing. When the grandfather then asked, "from your father," Laurel said "yes." The police noted the report as a "possible disclosure" of sexual abuse, but took no action.

In September 2005, a friend of Todd's made a statement to the police that Laurel had reported that Miller had spanked her in the groin area. Todd filed an *ex parte* petition for temporary stay of visitation between Miller and the children alleging that the children reported being spanked by Miller and a third party in the groin area and that Laurel had displayed "other alarming behavior of a sexual nature," referring to the grandfather's report to the police in June. As a result of these allegations, the court issued an order prohibiting Miller from having any contact with the children "until this matter is duly investigated and any and all allegations of abuse are deemed unfounded." After an investigation that included a second pelvic examination of Laurel, the New Hampshire Division for Children, Youth, and Families (DCYF) closed the matter as unfounded. Details of the alleged abuse were sent to the Manchester Police Department which, after investigation, also concluded that the charges were unfounded. A copy of the report was sent to the Hillsborough County Attorney.

In November 2005, Todd and the children's therapist reported to DCYF that Laurel had stated that Miller took "pictures of her with her clothes off," made her "eat his pee pee" and "panks her in the front." On January 30, 2006, DCYF sent a letter to Miller stating that it had determined that he was "the individual responsible for the abuse" and that his name would be entered "on its central registry of founded child abuse and neglect reports." Miller appealed the finding and, on February 24, 2006, DCYF rescinded its initial determination. In a letter to Todd, DCYF informed her that new evidence had come to its attention and that "the assessment regarding your children has been closed **unfounded**." DCYF stated that "[t]here has been a concern that Laurel has been coached with the

information that she has been disclosing. Please understand that this . . . type of coaching, if proven, is equally as abusive to a child as if the abuse had actually occurred." The matter was also referred to the Manchester Police Department, which investigated but did not pursue charges.

In July 2006, the parties agreed to be evaluated by psychologist Peggie Ward "to investigate and make recommendations . . . on the issues of a parenting/custody assess[ment], abuse allegations by both parties, parental alienation issues, scripting issue[s] and any and all other issues . . . which she deems relevant." On December 18, 2007, Dr. Ward issued an eighty-eight page report in which she considered several hypotheses. First, Dr. Ward posed the hypothesis that "Laurel was not sexually abused by her father or anyone else." Dr. Ward noted that both children were subjected to multiple examinations and questioning and that Laurel's statements to the Child Advocacy Center "do not appear to be consistent with her initial statement nor do they have a good deal of context." Dr. Ward opined that "this hypothesis may be supported by the data" in that "Laurel's presentation is less consistent with a child who has been repeatedly sexually abused."

Second, Dr. Ward posed the hypothesis that "Laurel was sexually abused or inappropriately touched by Mr. Miller." Dr. Ward noted that "Laurel's statements and behaviors are less consistent with child sexual abuse than they are of premature focus on the genital area followed by a good deal of anxiety and distress about sexual abuse from both Janet Todd as well as [Todd's mother]." Due to the "lack of context and the lack of memory regarding abusive behavior, combined with multiple physical exams and multiple interviews," it was "impossible to determine whether Laurel was sexually abused by her father." Dr. Ward's opinion was that "Laurel's presentation is less consistent with a child sexually abused by her father and more consistent with other hypotheses."

Third, Dr. Ward posed the hypothesis that Todd "has deliberately coached the children in what to say and scripted their responses." It was Dr. Ward's opinion that "this hypothesis is not the hypothesis best supported by the data."

Fourth, Dr. Ward posed the hypothesis that "Todd came to believe that Laurel, not Lindsay, was sexually abused by Mr. Miller." It was Dr. Ward's opinion that this hypothesis "is the most likely hypothesis supported by the data. That is, that Ms. Todd, after experiencing her parent's concerns about Mr. Miller and after having experienced her own negative interactions with Mr. Miller, became increasingly convinced that Mr. Miller was harming Laurel." Referring to a psychological report on Todd that was prepared in August 2007 by Dr. David Medoff, Dr. Ward noted that

[p]sychological testing shows that Ms. Todd has a "serious impairment in her ability to accurately process the information she takes in from her surroundings and the degree of misperception she demonstrates has major implications for her adaptive functioning. Ms. Todd's level of distortion is substantial and predisposes her to misunderstanding and misconstruing intentions, motivations and actions of other people. This places her at great risk for faulty judgment, for errors in decision-making, and for behaving in ways that are based on inaccurate information. These data indicate that Ms. Todd will not only fail to recognize or foresee the consequences of her actions at times, but that she will also become confused at times in separating fantasy from reality."

As Dr. Ward explained,

Ms. Todd has the liability of distortion of information and failure to accurately identify intentions, motivations and behavior of others. Ms. Todd's emotional state placed her at risk for misinterpreting information that she gained from her environment, adamantly believing that Laurel was sexually abused, and acting with full force on this information.

Dr. Ward thus concluded that "the hypothesis that Ms. Todd unintentionally but clearly caused Laurel to come to believe that she has been sexually abused by her father is the hypothesis best supported by the data."

In making her recommendations, Dr. Ward cautioned that "[w]hile it is unlikely that Mr. Miller has sexually abused Laurel, it is not possible to say with an absolute certainty that he did not." She concluded, however, that while it is "likely that Janet Todd did influence her children with her negative beliefs about Mr. Miller, from her psychological profile, it is most likely that her feelings colored her perceptions and that she not only came to see Mr. Miller as harmful to Laurel but also did not protect the children from her feelings." In addition, Dr. Ward noted that "Ms. Todd's parents appear to have wholly and adamantly accepted that Mr. Miller is a pervasive negative influence on his children. Mrs. Todd in particular is active in helping her daughter prove that Mr. Miller sexually abused the children." Finally, Dr. Ward noted that "Laurel's therapist is convinced that Laurel has been sexually abused, and may have inadvertently reinforced the abuse by making a 'book' with Laurel about her abuse."

At the time Dr. Ward submitted her report in late December 2007, Miller had not seen his children, outside of Dr. Ward's office, since September 2005. Because the children had no present relationship with Miller, Dr. Ward recommended therapeutic reunification. Dr. Ward noted that the

"children and their father have lost time that they cannot bring back. Once the relationship between Mr. Miller and the children is both more positive and more stable a parenting plan should be worked out wherein the children can spen[d] significant periods of time with their father."

On January 7, 2008, the trial court issued an order addressing Dr. Ward's evaluation and recommendations. The court noted that as a result of Todd's allegations of sexual abuse, Miller "has had little meaningful parenting time for the past two years, other than when he and the children met with Dr. Ward as part of her evaluation." The court expressed its intent

> to set a course for the **immediate** *therapeutic* reunification of the children with their father. Too much time has already passed and too much opportunity has been lost. The children certainly deserve better. [Todd] asserts that she accepts the goal of reunification, but wants it to proceed at a slow pace. The court is convinced that [Todd's] pace for reunification is far too slow and is premised on assertions which may not be true.

The court noted that although Miller had already identified a reunification therapist, Todd had "made no such effort whatsoever." The court ordered that the parties immediately contact Kelly Khachadourian to begin the therapeutic reunification process, that Todd immediately reenroll in counseling, and that her therapist be given a copy of Dr. Ward's evaluation and Todd's own psychological evaluation. The court found "that the children's best interests require that they 'normalize' their relationship with their father. It is extraordinarily harmful to them to deprive them of a relationship with one parent, especially when the reasons for doing so appear to be wholly unjustified." The court expressed that it did

> not doubt that [Todd] feels justified in objecting to [Miller] having parenting time because of her concerns about sexual abuse, but the objective evidence does not corroborate her concerns. In fact, Dr. Ward's evaluation and the parties' psychological evaluations raise the very real possibility that unless the children's circumstances are immediately addressed, they risk abuse from a different source.

On March 6, 2008, following a hearing, the trial court issued an order stating that its "hope that progress could be made in [Miller's] reunification with the parties' minor children was misguided." The January 7, 2008 order setting forth a plan for restoring the relationship "failed in relatively short order." The court attributed responsibility for its failure to both parties: "[Miller] because of his insistence and belligerence with the reunification therapist" and Todd "because of her fanciful concern about the therapist's

'fraudulent billing' of insurance." The court ordered that the parties enroll in reunification counseling with a new therapist and that they develop a schedule which gives Miller "some increasingly longer periods of parenting time" during the reunification process. The court stated that it was "growing increasingly convinced that [Todd's] insistence that [Miller] sexually abused the children is the single biggest obstacle to restoring [Miller's] relationship with them. If her insistence continues to be so intractable, [it] may be left with no alternative short of modifying the children's primary residence." Further, the court denied Todd's request to depose the children's former therapist, stating that Todd's "representation that [the therapist] is the source for her conviction that the children were sexually abused is, at this point, irrelevant; whatever the source of her belief, the fact is that she continues to hold to it no matter the evidence to the contrary."

On May 15, 2008, following a hearing, the court, after noting that the parties "have no interest to cooperate in what they both profess to believe — that the children need [to] rebuild their relationship with their father," ordered that they begin reunification therapy near Miller's home in New York no later than July 1, 2008. Following an *ex parte* motion filed by Miller alleging that Todd's continued interference with the reunification process required immediate modification of residential custody, the court stated that if Todd and the children did not appear for the July 8, 2008 appointment, it would consider Miller's request for sole decision-making and residential responsibility.

On August 25, 2008, following a hearing, the court recognized that although the parties "agree that they have made considerable progress since the [May] hearing . . . in reunifying the minor children with [Miller]," that "good news quickly degenerated into a heated argument about the next step in the process." Miller wanted temporary primary residential responsibility of the children so he could bring them to New York to complete the reunification therapy, while Todd contended that request was "decidedly not in the children's best interests." The court stated that it understood that Miller is convinced that Todd

> has alienated the children and is responsible for the children's estrangement from him; he may be right, but that does not change the fact that the children will require time to adjust to the change(s). The process of restoring his contact with the children has begun [and] is proceeding reasonably well, and the children's best interests require that he be patient with the process.

As for Todd, the court stated that she

> continues to be unwilling to recognize the damage she has done to the children's relationship with their father. She offers no real practical suggestions for how to continue the restoration of the relationship; rather, she leaves it up to him to work out the arrangements, presumably by his traveling to New Hampshire to continue the reunification therapy.

Accordingly, the court set forth a schedule to allow Miller to continue the reunification therapy and appointed a guardian ad litem.

In October 2008, Miller filed an *ex parte* motion again seeking modification of residential responsibility "made necessary due to the fact that [he] ha[d] not had any contact with his children since August 14, 2008." Following a hearing on the motion, the court stated that it remained "convinced that [Todd] is not invested in the process of reunifying [Miller] with the parties' minor children." The "uncontroverted evidence" demonstrated that Miller had not seen the children since August "for reasons entirely unclear to the court," that Todd had offered parenting time to Miller for a couple of days in August "but then reneged," and that Todd neither met Miller in New Hampshire when he came to pick up the children, nor did she bring the children to New York. The court noted that Miller was not blameless in that he "unreasonably insists that his reunification with the children be done on his terms, and his impatience with the process has now caused the second reunification therapist to withdraw from this case. He chose both therapists, but his conduct has made their work nearly impossible." Concluding that only a specific schedule of parenting time would guarantee Miller's contact with the children, the court set forth a visitation schedule.

In March 2009, the guardian ad litem filed an *ex parte* motion to cancel the custodial time the children were scheduled to have with their father during the weekend beginning March 20, 2009. The motion indicated that "[o]n 3/18/09 Janet Todd told the GAL that the children disclosed to her inappropriate touching by their father . . . during their last custodial time with [him]." In response, the trial court scheduled a hearing and, in the interim, ordered that the "father shall *not* have parenting time." At the hearing, the guardian stated that Todd claimed Lindsay reported that "daddy touched her pee-pee. She told him not to and he did it anyway, and that there was also a threat in there that if they told anyone, he would kill their mother." Following the hearing, the court ordered that Miller's parenting time was not suspended but ordered the guardian ad litem and Todd to report the disclosures to DCYF "immediately." DCYF investigated and closed the matter as unfounded. In a letter to the parties, DCYF recommended that both Laurel and Lindsay engage in individual therapy

and that the parents participate in a Child Impact Seminar to understand "the impact it has on children to have a relationship with both parents." DCYF also stated that "[i]f we shall get another report in with further concerns for Lindsay and Laurel and they have not started therapy, [t]he Division for Children, Youth and Families may be forced to take a different course of action."

In April 2009, the guardian ad litem filed a statement with the court indicating that Laurel's first grade teacher had reported that on April 20 Laurel began to cry in class and disclosed that during her most recent visit with her father he said that he was going to hurt her mother and there was nothing she could do to stop him. In response, Miller filed a motion to modify custody of the children due to new acts of child abuse. Following a hearing, the court denied the motion. The court noted that it understood

> that [Miller] fears that this new allegation, when combined with previous ones and the recent one in March, is a "slippery slope" spiraling into new and more serious ones. The court will carefully consider all that has happened before March and since. The Final Hearing is scheduled in July, only two months away. Until then, the court does not find a risk of imminent harm to justify the uprooting of the children, especially so close to the end of the school year.

Following a three-day hearing, the master issued his recommendations regarding custody, which were approved by the trial court on September 8, 2009. The master found that in 2005 the court had "suspended father's parenting time because of mother's allegations that he sexually abused Laurel" but that "DCYF investigated and ultimately made no findings of sexual abuse." The master found that Dr. Ward's "thorough and extraordinarily perceptive" parenting assessment included the conclusion "that the girls are being exposed to something that undermines their relationship with father." The master found that Miller's expert, Dr. Garber, shared this conclusion. The master also found that Todd "believes that 'something sexual definitely happened (to Laurel) by [Miller]'" and that Dr. Ward "opine[d] that mother 'influence(d) her children with her negative beliefs about (father) . . . (and) did not protect the children from her feelings.'"

Regarding the children, the master found that they have lived primarily with their mother in New Hampshire for nearly five years, where they have attended school. He found that they have friends in New Hampshire and a close relationship with their maternal grandparents. In addition, he found that although they have reestablished a healthy bond with their father, have made friends in New York, and enjoy their time with their father's brother and mother, a move to New York would be a drastic change requiring them

to leave most of what they have known during their formative years and would not be in their best interest. Accordingly, the master concluded that "the girls' best interests require that they continue living primarily with their mother in New Hampshire."

Miller raises three issues on appeal. First, he argues that the trial court erred in awarding Todd parenting responsibility when she has "engaged in a sustained campaign to alienate the children from [him], and to interfere with his parenting rights, by making multiple accusations of sexual abuse." Second, he argues that the trial court erred in not providing him a timely opportunity to view videotaped interviews with Laurel. Third, he argues that Supreme Court Rule 3 providing for mandatory review of appeals involving married parents but discretionary review of appeals involving non-married parents is unconstitutional.

■ The trial court has wide discretion in matters involving custody and visitation. *In the Matter of Choy & Choy*, 154 N.H. 707, 713 (2007); *see* RSA 461-A:20 (Supp. 2010) ("Any provision of law that refers to the 'custody' of minor children shall mean the allocation of parental rights and responsibilities as provided in this chapter.").

> Our review is limited to determining whether it clearly appears that the trial court engaged in an unsustainable exercise of discretion. This means that we review only whether the record establishes an objective basis sufficient to sustain the discretionary judgment made, and we will not disturb the trial court's determination if it could reasonably be made.

*Choy*, 154 N.H. at 713 (quotation and citations omitted). We review a trial court's statutory interpretation *de novo. Id.* at 711.

■ "When determining matters of child custody, a trial court's overriding concern is the best interest of the child." *In the Matter of Martin & Martin*, 160 N.H. 645, 647 (2010), *cert. denied*, 131 S. Ct. 1046 (2011). RSA chapter 461-A, the Parental Rights and Responsibilities Act, states that "children do best when both parents have a stable and meaningful involvement in their lives." RSA 461-A:2, I (Supp. 2010). Accordingly, it is the policy of this state to "[s]upport frequent and continuing contact between each child and both parents" and to "[e]ncourage parents to share in the rights and responsibilities of raising their children." RSA 461-A:2, I(a), (b). The Act codifies the "best interests of the child" criteria, setting forth twelve factors that the court must consider, including:

> (e) The ability and disposition of each parent to foster a positive relationship and frequent and continuing physical, written and

telephonic contact with the other parent, except where contact will result in harm to the child or to a parent.

(f) The support of each parent for the child's contact with the other parent as shown by allowing and promoting such contact.

(g) The support of each parent for the child's relationship with the other parent.

RSA 461-A:6, I(e)-(g) (Supp. 2009) (amended 2010).

■ "Across the country, the great weight of authority holds that conduct by one parent that tends to alienate the child's affections from the other is so inimical to the child's welfare as to be grounds for a denial of custody to, or a change of custody from, the parent guilty of such conduct." *Renaud v. Renaud*, 721 A.2d 463, 465-66 (Vt. 1998). "[A] child's best interests are plainly furthered by nurturing the child's relationship with both parents, and a sustained course of conduct by one parent designed to interfere in the child's relationship with the other casts serious doubt upon the fitness of the offending party to be the custodial parent." *Id.* at 466. As we have recognized, "the obstruction by a custodial parent of visitation between a child and the noncustodial parent may, if continuous, constitute behavior so inconsistent with the best interests of the child as to raise a strong possibility that the child will be harmed." *Webb v. Knudson*, 133 N.H. 665, 673 (1990); *see also In the Matter of Kosek & Kosek*, 151 N.H. 722, 728 (2005).

■■ In addition, many courts have held that unfounded allegations of sexual abuse made by one parent can be grounds for granting custody to the other parent. *See, e.g., Young v. Young*, 628 N.Y.S.2d 957, 962 (App. Div. 1995); *Hartman v. Hartman*, 621 N.E.2d 917, 920 (Ill. App. Ct. 1993), *appeal denied*, 631 N.E.2d 708 (Ill. 1994); *Mack-Manley v. Manley*, 138 P.3d 525, 531 (Nev. 2006); *Turner v. Turner*, 689 N.Y.S.2d 269, 270 (App. Div. 1999).

In *Beekman v. Beekman*, 645 N.E.2d 1332, 1336 (Ohio Ct. App. 1994), the court reasoned:

Although a court grants one parent custody and the other visitation, the children need to know that they are loved by both parents regardless of the antagonism the parents might feel for each other. It is the duty of each parent to foster and encourage the child's love and respect for the other parent, and the failure from that duty is as harmful to the child as is the failure to provide food, clothing, or shelter. Perhaps it is more harmful because no

matter how well fed or well clothed, a child cannot be happy if he or she feels unloved by one parent.

When a court makes a custodial decision, it makes a presumption that the circumstances are such that the residential parent will promote both maternal and paternal affection. The residential parent implicitly agrees to foster such affection, not out of any good feeling toward the nonresidential parent, but out of the need of the child for both parent's love. Where the evidence shows that after the initial decree the residential parent is not living up to the court's presumption and is attempting to poison the relationship between the ex-spouse and the child, this is a change of circumstances that warrants a modification of the prior custody decree. Unsubstantiated allegations of abuse are the worst kind of poisoning of the relationship.

■The trial court's order in the case before us does not cite RSA chapter 461-A, nor does it mention the application of the statutory factors to the specific facts before it. There is no clear indication in the court's order whether it considered "[t]he ability and disposition of each parent to foster a positive relationship . . . with the other parent," RSA 461-A:6, I(e), "[t]he support of each parent for the child's contact with the other parent," RSA 461-A:6, I(f), or "[t]he support of each parent for the child's relationship with the other parent," RSA 461-A:6, I(g), in determining the best interests of the children. *See In the Matter of Rossino & Rossino*, 153 N.H. 282, 284 (2006) (trial court's determination as to custody apparently did not take into account actions of the wife and impact of wife's repeated lawsuits on husband's ability to maintain contact with his children).

Based upon the record before us, the negative ramifications of Todd's unfounded belief that Miller has sexually abused his children, and continues to do so, are several and serious. First and foremost, the false allegations of abuse significantly interfered with Miller's visitation and deprived him of any relationship with his children for years. Further, as a result of the false allegations, both children have been subjected repeatedly to invasive physical examinations, they have been interviewed by DCYF and law enforcement, they have been evaluated by Dr. Ward, they have had two guardians ad litem and they have twice participated in reunification therapy. These actions were not in the children's best interests. *See Watson v. Poole*, 495 S.E.2d 236, 239 (S.C. Ct. App. 1997) (numerous physical examinations and counseling sessions for unfounded sexual abuse are not in the child's best interest); *Ellis v. Ellis*, 747 S.W.2d 711, 715 (Mo. Ct. App. 1988) (mother's attempt to deprive child of opportunity to know and love father by interfering with father's visitation is not in child's best interest);

*Theisen v. Theisen*, 405 N.W.2d 470, 474 (Minn. Ct. App. 1987) (mother created and maintained atmosphere of unwarranted suspicion and accusation regarding conduct of father toward children resulting in psychological damage); *C.J.L. v. M.W.B.*, 879 So. 2d 1169, 1178 (Ala. Civ. App. 2003) (not in child's best interests to be raised by a mother so bitterly opposed to child's father).

Despite Todd's admissions that she does not know whether any of the alleged incidents actually occurred, that she has no evidence that Miller has done anything wrong, and that she may not believe the allegations herself, there is no indication in the record that Todd's conduct of pursuing unfounded allegations of sexual abuse will cease. *See Theisen*, 405 N.W.2d. at 472 (mother's repeated attempts to alienate the children from their father and her pattern of conduct, having existed over the years, is unlikely to change); *cf. Renaud*, 721 A.2d at 467-68 (mother's reports of alleged sexual and physical abuse of son by father, although unsubstantiated, were wholly reasonable and her actions were transitory, unlikely to be repeated, and subject to cure).

The trial court awarded custody to Todd primarily because the children have spent the majority of their lives with her and that is where they are most comfortable. However, it was because of the unfounded allegations of sexual abuse that Miller was denied *any* contact with his children for over two years and had little opportunity to establish a home life with them between 2004 and 2009. This raises the question whether Todd has benefitted from her misbehavior. In *Begins v. Begins*, 721 A.2d 469, 470-71 (Vt. 1998), the children's relationship with their mother deteriorated following the parents' separation due to the fact that the father unfairly blamed her for the parties' marital problems and made disparaging remarks about her lifestyle. The trial court concluded that the boys' hostility toward their mother, encouraged and fueled by their father, precluded an award of custody to mother. *Id.* at 471. Although the court found that father did not "deserve to win custody," it concluded that it had no choice but to award custody to him. *Id.* (quotations omitted). The Vermont Supreme Court rejected such reasoning. *Id.* at 472. As the court stated:

> Although obviously well intended, the court's decision effectively condoned a parent's willful alienation of a child from the other parent. Its ruling sends the unacceptable message that others might, with impunity, engage in similar misconduct. Left undisturbed, the court's decision would nullify the principle that the best interests of the child are furthered through a healthy and loving relationship with both parents.

*Id.*; *see Mack-Manley*, 138 P.3d at 528 (trial court found children's best interests not served by ignoring mother's unsubstantiated child abuse and neglect allegations); *Young*, 628 N.Y.S.2d at 963 (trial court's decision noticeably silent as to mother's false allegations and it was clear the court failed to consider evidence that mother willfully interfered with father's relationship with the children).

Dr. Ward's report, characterized by the master as "thorough and extraordinarily perceptive," contains several conclusions particularly relevant to Todd's inability to foster a positive relationship with Miller and to support the children's contact with him. These include her conclusions that Todd caused Laurel to believe that she has been sexually abused by her father, that it is likely that Todd influenced her children with her negative beliefs and did not protect the children from her feelings, that Todd's parents have "wholly and adamantly" accepted that Miller is a pervasive negative influence on the children, and that Todd's mother is active in helping her daughter prove that Miller sexually abused the children.

We conclude that the award of parental rights and responsibilities must be vacated and the case remanded for reconsideration in light of this opinion. On remand, the trial court must consider the factors set forth in RSA 461-A:6, I(e)-(g) in determining the children's best interests in this case. Also, the court should consider the applicability of the recent amendment to RSA 461-A:6, IV (Supp. 2010). It is within the trial court's discretion to take into consideration any additional circumstances that may have occurred while this appeal was pending.

The second issue Miller raises on appeal is whether the trial court erred in not providing him a timely opportunity to view videotaped interviews conducted by the Child Advocacy Center in Portsmouth with his daughter Laurel. However, Miller's attorney conceded at oral argument that this issue is moot. Accordingly, we need not address it further.

The final issue raised is whether Supreme Court Rule 3 is unconstitutional because it provides differing treatment to married and unmarried parents with respect to issues involving children.

Supreme Court Rule 3 provides in part:

> "Mandatory appeal": A mandatory appeal shall be accepted by the supreme court for review on the merits. A mandatory appeal is an appeal filed by the State pursuant to RSA 606:10, or an appeal from a final decision on the merits issued by a superior court, district court, probate court, or family division court, that is in compliance with these rules. Provided, however, that the following appeals are <u>NOT</u> mandatory appeals:
>
> . . .

(9) an appeal from a final decision on the merits issued in, or arising out of, a domestic relations matter filed under RSA Title XLIII (RSA chapters 457 to 461-A); provided, however, that an appeal from a final divorce decree or decree of legal separation shall be a mandatory appeal.

Having exercised our discretion and accepted this appeal, we hold that the question concerning the constitutionality of Rule 3 as applied to this case is moot. Any consideration regarding amending Rule 3 should be accomplished in accordance with the rule-making procedures set forth in Supreme Court Rule 51, thereby providing the public, the bench and the bar an opportunity to offer comments and suggestions.

*Vacated and remanded.*

DALIANIS, C.J., and DUGGAN and CONBOY, JJ., concurred.