NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

7th Circuit-Rochester Family Division
No. 2018-0700

IN THE MATTER OF MATTHEW KAMIL AND ROBIN KAMIL

Argued: January 28, 2020
Opinion Issued: July 10, 2020

Law Offices of F. Michael Keefe, PLLC, of Manchester (F. Michael Keefe on the brief and orally), for the petitioner.

Soule, Leslie, Kidder, Sayward & Loughman, PLLC, of Salem (David W. Sayward on the brief and orally), for the respondent.

HICKS, J. The petitioner, Matthew Kamil (Husband), appeals, and the respondent, Robin Kamil (Wife), cross-appeals, various orders of the Circuit Court (Foley, J.) in their divorce action. We affirm in part, reverse in part, vacate in part, and remand.

The trial court found the following facts. The parties were married in September 2007 and have two children. Husband filed for divorce on February 17, 2015, and Wife cross-petitioned. On April 6, 2015, Husband was awarded temporary primary residential responsibility for the children and Wife was awarded supervised visitation. The court also appointed a parenting coordinator.

The parties "agreed to participate in a Child Centered Family Systems Evaluation performed by Dr. Ben Garber" and later "agreed to accept Dr.

Garber's findings and recommendations." Accordingly, a plan was developed "to follow Dr. Garber's guided therapeutic path" (the Garber Plan). By March 31, 2017, however, "the parenting evidence was that [Wife] was not allowing the therapeutic reunification plan to succeed."

The court nevertheless continued to order supervised visitation for Wife at a visitation center, and, on January 30, 2018, the court "appointed Tracey Tucker to serve in an evaluative, structured, scripted reunification capacity, focusing on the children's needs to have safe and appropriate contact with their mother." After only four sessions, Tucker cancelled the reunification work on May 30, 2018, "when [Wife] made some impulsive and inappropriate comments to [her]." At that point, Wife's supervised contact with the children ended.

Meanwhile, the court held a series of hearings to determine the authenticity and enforceability of a prenuptial agreement executed by the parties approximately one month prior to their wedding. The court ultimately found the prenuptial agreement unenforceable. Alternatively, the court found that even if it had not found the agreement invalid in its entirety, the agreement's waiver-of-maintenance provision was "unconscionable and therefore unenforceable."

On October 31, 2018, the court issued a final divorce decree. After choosing a February 2015 asset valuation date, the court awarded Husband the marital residence, awarded Wife the entirety of her Roth IRA, and equitably divided the remaining assets between them. To effectuate the equitable division, Husband was ordered to pay Wife $1,011,359.88. Additional facts will be recited below as needed to address specific issues raised by the parties.

On appeal, Husband argues that the trial court erred by: (1) invalidating the prenuptial agreement under an erroneous interpretation of New York law; (2) admitting and relying upon Wife's medical records that were incomplete and untimely produced; (3) awarding permanent alimony despite Wife's failure to provide evidence to support such award; (4) ordering him to bear the cost of a therapeutic reunification process for Wife and the children; and (5) ordering him to prepare any qualified domestic relations orders (QDROs) or "other vehicles" necessary to divide the parties' assets. Wife, on cross-appeal, argues that the trial court erred by: (1) failing to consider, or hold a rehearing to address, the issue of Husband's remainder interest in his parents' irrevocable trust; (2) failing to award her any of the appreciation to, or interest on, her share of the parties' financial accounts accruing after the valuation date; (3) failing to award her "statutory interest on her property division share for each day her share is not paid after the date ordered by the trial court"; (4) ordering her to pay one-half of any capital gains taxes incurred by Husband's sale of assets to pay her property division share; (5) denying any parenting time to her; (6) requiring, as a precondition to any visitation with the children, that she

"demonstrate to a non-judicial third party's . . . satisfaction that she has acquired certain skills"; (7) awarding her only the personal property in her possession at the time of the final divorce decree and failing to award her any personal property located in the marital home; (8) failing to bifurcate the divorce and make its parenting orders temporary; (9) failing to award her an advance on her property division share to cover her legal fees for post-divorce and appellate proceedings; and (10) "failing to make findings or provide a rationale for its orders" on issues she appealed.

I. Husband's Appeal

A. Validity of Prenuptial Agreement

We first address Husband's challenge to the trial court's invalidation of the parties' prenuptial agreement. The agreement was prepared by Husband's counsel and incorporated minor modifications proposed by Wife's counsel. On August 5, 2007, Husband and Wife went to her counsel's home office in New York where both executed the agreement, despite Wife's counsel's advice to her that she not do so. Wife's counsel witnessed and notarized her signature at that time.

Husband had his signature notarized at his counsel's New York office. Although the notary's acknowledgment bears the date of August 5, 2007, the notary testified that she would not have worked that day as it was a Sunday. She also testified that the handwritten digit "5" in the acknowledgement's date was not in her handwriting. The trial court found that Husband's signature was actually notarized on August 10, 2007, five days after he executed the agreement.

The agreement provides that it is to be governed by New York law. The trial court noted that "[t]here is a valid question as to whether [under New York law] an acknowledgment of a signature needs to be contemporaneous with the signature itself" and observed that, while "there appears to be a circuit split brewing within New York jurisprudence[,] . . . the New York Court of Appeals has not explicitly ruled on the issue." The trial court determined that the disagreement among New York courts required it to engage in statutory interpretation and concluded that contemporaneous acknowledgement was required. Husband contends that this was error.

Under New York law, "'[a]n agreement by the parties, made before or during the marriage, shall be valid and enforceable in a matrimonial action if such agreement is in writing, subscribed by the parties, and acknowledged or proven in the manner required to entitle a deed to be recorded.'" Galetta v. Galetta, 991 N.E.2d 684, 687 (N.Y. 2013) (quoting § 236(B)(3) of the New York Domestic Relations Law). "Pursuant to the [New York] Real Property Law, proper acknowledgment or proof is an essential prerequisite to recording a deed

in the office of the county clerk.  Such acknowledgment or proof, moreover, must meet various specifications."  Matisoff v. Dobi, 681 N.E.2d 376, 379 (N.Y. 1997) (citation omitted).  The New York Court of Appeals has observed that the applicable statute "recognizes no exception to the requirement of formal acknowledgment" and has therefore held that "the requisite formality" so specified "is essential."  Id. at 378.  Accordingly, the Matisoff Court further held that "an unacknowledged agreement is invalid and unenforceable in a matrimonial action."  Id. at 381.

The trial court here essentially ruled that because the acknowledgment of Husband's signature did not occur at the time he executed the agreement, the parties' prenuptial agreement was effectively unacknowledged and, therefore, invalid.  Accordingly, the issue before us is whether the signing of a document must occur in the presence of a notary in order for the notary's acknowledgment of the signature to be valid under New York law.  Our task is to apply New York law as interpreted by that state's highest court, and, in the absence of a definitive ruling by that court, to predict how it would rule if it were faced with the issue before us.  See Fantis Foods v. North River Ins., 753 A.2d 176, 183 (N.J. Super. Ct. App. Div. 2000) ("We see no reason why a different rule ought to govern state court judges in determining the law of a sister state than governs federal judges in identifying the law of any state," which is "to look at the opinions of the state's highest court and, if it has not addressed the question, to predict how, in the light of developing law both within and without the state to date, it would decide.").

The trial court correctly observed that New York's highest court has not directly ruled on the issue before us.  The court in Matisoff noted the issue, observing that the applicable statutes "do not specify when the requisite acknowledgment must be made" and that "[i]t is therefore unclear whether acknowledgment must be contemporaneous with the signing of the agreement." Id. at 381.  The court did not have to resolve the issue, however, because the postnuptial agreement in Matisoff was never acknowledged by a notary; rather, the defendant sought to cure the lack of acknowledgment through "plaintiff's 'oral acknowledgment' at trial that the parties signed the agreement."  Id. at 379, 381.

The Court of Appeals again addressed the requisites of a valid acknowledgment in Galetta, where the prenuptial agreement at issue bore an acknowledgment that the court held to be defective.  Galetta, 991 N.E.2d at 686, 689.  There, the court explained:

> Three provisions of the Real Property Law must be read together to discern the requisites of a proper acknowledgment.  Real Property Law § 292 requires that the party signing the document orally acknowledge to the notary public or other officer that he or she in fact signed the document.  Real Property Law § 303 precludes an

4

acknowledgment from being taken by a notary or other officer "unless he [or she] knows or has satisfactory evidence[ ] that the person making it is the person described in and who executed such instrument." And Real Property Law § 306 compels the notary or other officer to execute "a certificate . . . stating all the matters required to be done, known, or proved" and to endorse or attach that certificate to the document. The purpose of the certificate of acknowledgment is to establish that these requirements have been satisfied: (1) that the signer made the oral declaration compelled by Real Property Law § 292; and (2) that the notary or other official either actually knew the identity of the signer or secured "satisfactory evidence" of identity ensuring that the signer was the person described in the document.

Id. at 687-88.

Husband contends that the acknowledgment in this case complies with the requisites recognized in Galetta and that execution in the notary's presence is not required. He argues, "As a matter of common sense, if Galetta required the parties' execution [to] be simultaneous and in the presence of the notary there would be no reason to mandate an 'oral declaration' because the notary would have seen the signing occur." We agree.

While the Galetta Court did not explicitly state that execution need not take place in the notary's presence, a New York intermediate appellate court has specifically noted that the Real Property Law section providing the form of acknowledgment at issue here "does not require the notary to observe the execution." Matter of Estate of Levinson, 784 N.Y.S.2d 165, 167 (App. Div. 2004); see Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000) (noting that, in determining how the New York Court of Appeals would decide an issue on which it has not yet ruled, "the decisions of New York State's Appellate Division are helpful indicators"). This fact was also noted by the trial court in B.W. v. R.F., 35 N.Y.S.3d 853 (Sup. Ct. 2016), which explained:

Real Property Law § 292 differentiates between conveyances that are acknowledged and conveyances that are proved by use of a subscribing witness. In pertinent part, this section of the Real Property Law reads "such acknowledgment can be made only by the person who executed the conveyance, and such proof can be made only by some other person, who was a witness of its execution, and at the same time subscribed his name to the conveyance as a witness." Real Property Law § 292 does not state that the notary must say in the acknowledgment that he witnessed the signature.

B.W., 35 N.Y.S.3d at 855. The court ultimately concluded that the acknowledgment there complied with the requirements of Real Property Law § 292, which, "[a]s set forth in Galetta, . . . [are] that the party signing the document orally acknowledge to the notary public or other officer that he or she in fact signed the document." Id. at 855-56.

Husband also points out that the definition of "acknowledgement" in the "New York State-issued guidebook for the Notary Public License Law . . . very clearly states: 'It is not essential that the person who executed the instrument sign his name in the presence of the notary.'" N.Y. Dep't of State, Div. of Licensing Servs., Notary Public License Law at 14 (April 2019), https://www.dos.ny.gov/licensing/lawbooks/NOTARY.pdf (last accessed June 4, 2020). This view is consistent with that expressed in Corpus Juris Secundum. See 1A C.J.S. Acknowledgments § 42, at 185 (2016) ("[I]t is not necessary that an acknowledged instrument be executed in the presence of the appropriate officer.").

Wife, however, cites a number of New York intermediate appellate and trial court cases that, she contends, support the proposition that contemporaneous execution and notarization are required. She first cites Smith v. Smith, 694 N.Y.S.2d 194 (App. Div. 1999). The Smith Court, in affirming the trial court's invalidation of an antenuptial agreement based upon a defective acknowledgement, noted that "the discrepancies involved go to the very issue of whether the agreement was, in fact, signed by defendant in the presence of a notary public and, given the strict construction of this requirement, it may not be overlooked." Id. at 196.

In Smith, there were a number of discrepancies between the evidence and the facts asserted in the acknowledgment. Id. at 194-96. The court noted that these discrepancies, "strongly suggest[ed] that defendant did not actually sign the agreement before [the notary] as indicated in the written acknowledgment." Id. at 196 (emphasis added). Thus, the defect in Smith could be seen as not the defendant's failure to sign in the notary's presence, but that the agreement was not, in fact, notarized in the manner stated in the acknowledgment. That broader discrepancy called into question whether the agreement had been duly acknowledged in compliance with the relevant statutes even though it bore a facially valid acknowledgment. See id. at 195 ("[W]here a document on its face is properly subscribed and bears the acknowledgment of a notary public, it gives rise to a presumption of due execution, which may be rebutted only upon a showing of clear and convincing evidence to the contrary." (quotation and brackets omitted)). To the extent Smith could be read to espouse a requirement that execution take place in the notary's presence, we do not believe, for the reasons stated herein, that the New York Court of Appeals would adopt that interpretation. See Michalski, 225 F.3d at 116.

6

Wife also cites Schoeman, Marsh & Updike v. Dobi, 694 N.Y.S.2d 650 (App. Div. 1999), which involved a counterclaim for legal malpractice brought by the defendant in Matisoff against his counsel in the divorce action that precipitated that appeal.  See Schoeman, 694 N.Y.S.2d at 651.  The Schoeman Court rejected the claim that the defendant's counsel committed malpractice by failing "to request the trial court to certify the parties' acknowledgment of the agreement."  Id.  The court reasoned that "parties in the midst of a divorce proceeding should not be able to obtain retroactive validation of a postnuptial agreement.  An insistence upon the formalities mandated by the Legislature requires that the parties have contemporaneously demonstrated the deliberate nature of their agreement."  Id. (emphasis added).

The last sentence appears to reference the second of two functions served by acknowledgments that the Court of Appeals noted in Matisoff, 681 N.E.2d at 379, 381, and reiterated in Galetta: "The acknowledgment requirement fulfills two important purposes.  First, acknowledgment serves to prove the identity of the person whose name appears on an instrument and to authenticate the signature of such person.  Second, it necessarily imposes on the signer a measure of deliberation in the act of executing the document."  Galetta, 991 N.E.2d at 687 (quotation and citation omitted).

The Galetta Court did not suggest that signing in the presence of the notary was necessary to impose such a measure of deliberation, and language in Matisoff suggests that it is not.  In explaining how "the formality of acknowledgment underscores the weighty personal choices to relinquish significant property or inheritance rights, or to resolve important issues concerning child custody, education and care," the Matisoff Court utilized the reasoning from a prior case explaining "the similar prerequisites for proper execution of a deed of land":

> When [the grantor] came to part with his freehold, to transfer his inheritance, the law bade him deliberate.  It put in his path formalities to check haste and foster reflection and care.  It required him not only to sign, but to seal, and then to acknowledge or procure an attestation, and finally to deliver.  Every step of the way he is warned by the requirements of the law not to act hastily, or part with his freehold without deliberation.

Matisoff, 681 N.E.2d at 381 (quotation omitted).  Nothing in this explanation of the deliberative function requires that the notary observe the document's execution and, indeed, it is arguably better served by a second deliberative act of procuring an acknowledgment subsequent to execution of the document.

There may be valid reasons for limiting the time in which that second deliberative act of notarization may follow execution.  In Schoeman, the alleged malpractice was counsel's failure to "request the Trial Judge to execute a

7

certificate of acknowledgment of a 13-year old postnuptial agreement." Schoeman, 694 N.Y.S.2d at 651. Similarly, in Stein v. Stein, 825 N.Y.S.2d 335 (Sup. Ct. 2006), another case cited by Wife, the acknowledgment was procured long after the parties executed the prenuptial agreement at issue. Stein, 825 N.Y.S.2d at 340. The court ruled:

> Here, it is undisputed that plaintiff's signature was not duly acknowledged pursuant to [Domestic Relations Law] § 236 (B) (3) contemporaneous to his execution of the agreement. Rather, a certificate of acknowledgment was not generated with respect to such signature until March 21, 2005, almost 7½ years after the original execution of the document. Accordingly, given the lack of a properly executed contemporaneous certificate of acknowledgment with respect to plaintiff's signature, the court finds that the subject Agreement is unenforceable.

Id. (footnote omitted).

The foregoing illustrates that, even accepting these cases as requiring "contemporaneous" acknowledgement, there is no reason to read "contemporaneous" to mean "simultaneous." The dictionary definition of contemporaneous is: "existing or occurring in the same period of time." New Oxford American Dictionary 374 (3d ed. 2010). In other contexts, New York courts have considered events separated by much longer time periods than the five days at issue here to be contemporaneous. See, e.g., Swift v. New York Tr. Auth., 981 N.Y.S.2d 706, 709 (App. Div. 2014) ("[Doctor's] report noting that he began treating plaintiff a month after the accident provides sufficient contemporaneous proof of injuries." (citations omitted)); Salman v. Rosario, 928 N.Y.S.2d 531, 533 (App. Div. 2011) ("Plaintiff's objective evidence of injury, four months post-accident, was sufficiently contemporaneous to establish that plaintiff had suffered a serious injury within the meaning of the statute."); see also Nau v. Vulcan Rail & Construction Co., 36 N.E.2d 106, 110 (N.Y. 1941) (noting that "[e]ven though [three instruments] had been made at different dates, that fact would not affect the rule" that where the instruments "were executed at substantially the same time[ and] related to the same subject-matter, [they] were contemporaneous writings and must be read together as one"). We believe that even if the New York Court of Appeals were to interpret the applicable statutes to impose a contemporaneity requirement, it would find the events here — separated by a mere 5 days — to be contemporaneous. Accordingly, we disagree with the trial court's conclusion that "[a]lthough a five-day delay is much less than in any of the [New York] cases [reviewed], . . . [Husband's] certificate of acknowledgment nonetheless cannot be considered to be 'contemporaneous' with the execution of the prenuptial agreement."

Wife nevertheless asserts that "there are public policy and common sense reasons to support the requirement of a contemporaneous," which she

evidently interprets to mean simultaneous, acknowledgement, including the concern "that allowing an acknowledgment to follow an indeterminate amount of time after the execution of a nuptial agreement would essentially transform the agreement from a binding bilateral agreement into an option contract." The trial court shared that concern, for which both Wife and the trial court cited Stein in support. We read the applicable language in Stein, however, as merely an additional rationale for requiring contemporaneity as we have construed it, i.e., some length of time reasonably close to the document's execution:

> [W]ere the court to allow the Agreement, which would otherwise be deemed invalid due to the lack of a proper certificate of acknowledgment from the plaintiff, to become enforceable upon the provision of a certificate of acknowledgment generated some 7 ½ years after the initial execution of the document, such Agreement, would, in effect, become enforceable only upon the exercise of plaintiff's "option" to execute a valid certificate.

Stein, 825 N.Y.S.2d at 341. Allowing a reasonable period of time after execution to procure an acknowledgement would not turn an agreement the parties intend to be an "enforceable bilateral agreement" into an option contract, id.; rather, it is simply part of the process the New York legislature has required to make that intended bilateral agreement enforceable.

Wife points out that "the Court in Galetta noted that the acknowledgement requirement imposed by Domestic Relations Law § 236(B)(3) is onerous and, in some respects, more exacting than the burden imposed when a deed is signed." See Galetta, 991 N.E.2d at 687. The Galetta Court's notation of that fact however, does not change our analysis. The court stated:

> Although an unacknowledged deed cannot be recorded (rendering it invalid against a subsequent good faith purchaser for value) it may still be enforceable between the parties to the document (i.e., the grantor and the purchaser). The same is not true for a nuptial agreement which is unenforceable in a matrimonial action, even when the parties acknowledge that the signatures are authentic and the agreement was not tainted by fraud or duress.

Id. Recognition that an unacknowledged nuptial agreement, unlike a deed, is invalid even as to the parties addresses only the consequences of an omitted or invalid acknowledgment; it says nothing about what is required to constitute a valid acknowledgment.

Finally, Wife argues that the prenuptial agreement is invalid for a second reason; namely, that the notary's certificate is dated August 5, 2007, but was not actually notarized or acknowledged until August 10, 2007. Wife cites nothing to support the proposition that a 5-day discrepancy in the date on the

acknowledgement is sufficient to invalidate the agreement. Moreover, Weinstein v. Weinstein, 830 N.Y.S.2d 179 (App. Div. 2007), suggests the contrary. In Weinstein, the court ruled that where the prenuptial agreement at issue contained both "aspects to an acknowledgment: the oral declaration of the signer of the document and the written certificate, prepared . . . generally [by] a notary public," a "minor discrepancy in the date on which the document was executed was not, in itself, a basis to set aside the agreement." Weinstein, 830 N.Y.S.2d at 180-81. Accordingly, we reject Wife's argument that the erroneous date on the acknowledgement invalidates the agreement.

For the foregoing reasons, we reverse the trial court's ruling that Husband's 5-day delay in obtaining an acknowledgment renders the entire prenuptial agreement unenforceable. Accordingly, we also vacate the property division portion of the trial court's order and remand for a new property division consistent with this opinion. Because we vacate the property division, we need not address the parties' other arguments related thereto; specifically, Husband's challenge to the order requiring him to prepare any QDROs or other vehicles necessary to divide the parties' assets, and Wife's challenges related to: (1) Husband's remainder interest in his parents' irrevocable trust; (2) her request for award of the appreciation to, or interest on, her share of the parties' financial accounts; (3) her request for statutory interest on her property division share; (4) the order that she pay one-half of any capital gains taxes incurred liquidating assets to pay her property division share; and (5) the division of personal property. For the reasons set forth below, our reversal of the trial court's ruling that the entire prenuptial agreement was invalid due to a defect in the acknowledgement does not affect the court's alternative ruling that a particular provision of the agreement (the waiver of maintenance) was also unenforceable due to unconscionability.

### B. Admission of Medical Records

Husband next argues that the trial court erred in admitting and relying upon incomplete and untimely produced medical records of Wife. He argues that "the court's admission of these records, and reliance on the same in continuing its temporary alimony orders and ruling against the validity of the lump sum alimony payment" contained in the parties' prenuptial agreement was erroneous.

"We review a trial court's decision on . . . the admissibility of evidence under an unsustainable exercise of discretion standard." In the Matter of Hampers & Hampers, 154 N.H. 275, 280 (2006). "To meet this standard, [Husband] must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. We agree with Wife that the Husband has failed to demonstrate that admission of the medical records prejudiced his case.

In its order, the court stated, "Over [Husband's] objection[,] . . . I accepted as an exhibit the medical records of Brigham and Women's Hospital, generated pursuant to a previous Order. They appeared to be less than complete, but they did not prejudice [Husband] or confirm [Wife's] testimony that she cannot work as a physical therapist." (Emphasis added.) On this record, we conclude that Husband has failed to demonstrate that the court unsustainably exercised its discretion to the prejudice of his case by admitting the records.

## C. Alimony Award

Husband next argues that the trial court erred in its award of permanent alimony to Wife. Husband asserts that because Wife failed to submit requisite documentation, including her financial affidavit, at the time of the final hearing, and "offered almost no proof of temporary disability and no proof whatsoever of permanent disability or other medical limitations on employment," the alimony award "speculatively assumes a need that has neither been properly proven, nor otherwise established at the time of the final hearing." Husband notes that "[i]n the first instance, the trial court awarded approximately $1 million in assets to [Wife] in its final order," and argues that "given the assets awarded to [Wife]," the trial court unsustainably exercised its discretion by awarding Wife alimony absent proof of her need.

At the time of the trial court's alimony order, RSA 458:19 authorized the trial court to award alimony if, among other things, "[t]he party in need lacks sufficient income, property, or both, including property apportioned in accordance with RSA 458:16-a, to provide for such party's reasonable needs, taking into account the style of living to which the parties have become accustomed during the marriage." RSA 458:19, I(a) (2018) (amended 2018) (emphases added). Although the trial court did not specifically mention its property division in making its alimony award, we presume that it followed the statute. See RSA 458:19, IV(b) (2018) (amended 2018) ("In determining the amount of alimony, the court shall consider . . . the property awarded under RSA 458:16-a . . . ."). Accordingly, because we have vacated the property division, we also vacate the alimony award and remand for recalculation of alimony in light of, and in conjunction with, the new property division on remand. See In the Matter of Cohen & Richards, 172 N.H. 78, 94 (2019) (concluding that "the deferred compensation and severance payments are subject to equitable division as marital property," and vacating and remanding "the trial court's base alimony award that was based, in part, upon the court's consideration of the award of marital property").

## D. Costs of Therapeutic Reunification

Husband next argues that the trial court erred when it ordered him to be responsible for the costs of the therapeutic reunification process for Wife and

the children.  Husband contends that because Wife, "through her own obstructionist actions caused the failure of two prior reunification efforts," she "needs to have a stake in the game, and some sense of financial interest, (and resulting financial loss) should she once again fail to cooperate and/or successfully complete the ordered level I therapeutic reintegration process." Husband concedes that he has the ability to pay, but argues that "fundamental fairness dictates that [Wife] must have exclusive financial responsibility" for any further reunification efforts given her responsibility for the prior failures. Wife, on the other hand, argues that it was a reasonable exercise of the trial court's discretion "to require the party with vastly more assets and substantially more income" to pay those costs, particularly in light of the importance of reunification not just to Wife, but to the parties' children as well.

We conclude that Husband has failed to meet his appellate burden of demonstrating reversible error.  See In the Matter of Braunstein & Braunstein, 173 N.H. ___, ___ (decided February 13, 2020) (slip op. at 8).  Rather, what he asks of us is, in essence, to reweigh the equities on this issue, which is not our role on appeal.  See In the Matter of Heinrich & Heinrich, 164 N.H. 357, 365 (2012).  "Our standard of review is not whether we would rule differently than the trial court, but whether a reasonable person could have reached the same decision as the trial court based upon the same evidence."  In the Matter of Braunstein, 173 N.H. at ___ (slip op. at 8) (quotation omitted).  Based upon the evidence in this case, including that of Husband's far greater financial resources, a reasonable person could have reached the same decision as did the trial court.  Cf. Giles v. Giles, 136 N.H. 540, 547 (1992) (concluding that plaintiff "failed to establish that the master's allocation of visitation costs constituted an abuse of discretion" where "[a] great deal of evidence indicated that the plaintiff's financial condition was far stronger than the defendant's, and far less desperate than he claimed").

II.  Wife's Cross-appeal

A.  Parenting Time

Wife argues that the trial court erred in awarding her no parenting time with the children, even at a visitation center.  We interpret this argument as a challenge to the court's suspension of supervised visitation as distinct from the challenge to reimplementation of the Garber Plan discussed below.  The trial court has wide discretion in matters involving parenting rights and responsibilities, and "[o]ur review is limited to determining whether it clearly appears that the trial court engaged in an unsustainable exercise of discretion."  In the Matter of Miller & Todd, 161 N.H. 630, 640 (2011) (quotation omitted).  "This means that we review only whether the record establishes an objective basis sufficient to sustain the discretionary judgment made, and we will not disturb the trial court's determination if it could reasonably be made."  Id. (quotation omitted).

The trial court heard testimony from the parenting coordinator regarding Wife's previous supervised therapeutic visitation sessions with the children. Based on that testimony, the court found that, although Wife at first made progress in those sessions, she eventually "had a great deal of difficulty receiving parenting feedback" from the supervisor and the parenting coordinator and ultimately refused to work with either of them. As a result, Wife had no contact with the children from approximately June 2017 through March 2018.

In March, the court appointed Tucker "to monitor therapeutic, scripted, supervised visits." The court found that when such visitation resumed, the parties' daughter "felt a lot of anxiety" and their son "started acting out" as seeing their mother again after a lengthy absence "was confusing and difficult for them." That period of supervised visitation ended on May 30, 2018. Both the parenting coordinator and Husband testified that both children were doing better at the time of trial.

The trial court concluded, in accordance with recommendations of the parenting coordinator and Tucker, that "therapeutically supervised visits need to stop" and that Wife "needs to refocus and work on her own issues in individual therapy." The court stated:

> I find it is not in the children's best interest to have even supervised contact with their mother until [she] can demonstrate to Tracey Tucker's professional satisfaction that [she] has acquired the skills in individual therapy to always be present for the children in an emotionally safe capacity, on a regular and committed fashion, indefinitely. [Wife] needs to be able to demonstrate to Tracey Tucker that she is prepared to accept therapeutically supervised, scripted visitation until she has gained the right to unsupervised visits and eventually more.

On our review of the record, we conclude that it "establishes an objective basis sufficient to sustain the discretionary judgment" to suspend Wife's supervised visitation. Id. Because the trial court's determination is one that could reasonably be made, we do not disturb it. Id.

Wife's next challenge relates to the court-ordered involvement of Tucker discussed above. Wife argues that the trial court "erred in requiring [her] to demonstrate to a non-judicial third party's . . . satisfaction that she has acquired certain skills in order to have any visitation with the children." Wife asserts that "[p]lacing Ms. Tucker in the role of fact finder and decision maker as to how and when [she] may progress towards seeing her children constitutes an avoidance of official judicial responsibility and an impermissible delegation of it to a private citizen."

13

Although we have never ruled on this precise issue, we have held in other contexts that judicial authority cannot be delegated to a non-judicial third party.  See, e.g., State v. Canelo, 139 N.H. 376, 378-79, 382-83 (1995) (issuance of anticipatory search warrant constituted an inappropriate delegation of magistrate's constitutional function to prosecuting authority); McMullin v. Downing, 135 N.H. 675, 680-81 (1992) (where "plaintiff object[ed] to the trial court empowering investigation by a court expert, and delegating its fact finding and decision making authority, all outside the adversary crucible," we agreed that trial court "erred in this course of resolution"); see also Kidder v. Prescott, 24 N.H. 263, 265 (1851) (noting, in holding that magistrate could not delegate authority to sign a writ of summons, that "[w]hen the law confers upon an individual an authority to do an act, . . . in general, the power cannot be delegated to others" and that "[s]uch is the uniform rule where the exercise of the power involves the exercise of any discretion").

Courts in other jurisdictions that have addressed issues similar to the one before us "have held that the authority to determine the custody and visitation of a minor child cannot be delegated to a third party, because it is a judicial function." Walters v. Walters, 673 N.W.2d 585, 592 (Neb. Ct. App. 2004); see also Larocka v. Larocka, 43 So. 3d 911, 912 (Fla. Dist. Ct. App. 2010) (noting that Florida appellate courts "have consistently agreed with th[e] principle" that a "trial court may not delegate its statutory authority to determine visitation to third parties").  As the Colorado Court of Appeals explained, "The statutory scheme requires that the trial court itself make decisions regarding parenting time, and it may not delegate this function to third parties." In re D.R.V-A., 976 P.2d 881, 884 (Colo. App. 1999).

We agree with the foregoing principles.  It is the trial court's responsibility, under RSA chapter 461-A, to determine parental rights and responsibilities in cases of divorce and legal separation, see RSA 461-A:3 (2018), :4, :6 (Supp. 2018), and we now hold that the court may not delegate that responsibility to a third party.  Here, after suspending Wife's "[t]herapeutic, supervised visits," the court ordered Wife to continue her individual therapy to address issues related to the children, encouraged the children's therapists, Wife's therapist, and Tucker to "interact" with each other, requested Tucker "to monitor and participate in the process outlined above," and, finally, ordered: "If and when [Wife] can demonstrate to Tracey Tucker's professional satisfaction that both [Wife] and the children are prepared to restart their supervised, scripted visitations, Tracey Tucker shall restart the process as originally envisioned by Dr. Garber."

Although the final decree merely reinstitutes a supervised visitation plan that the trial court had already ordered (the Garber Plan), it also gives Tucker the sole discretion to determine when and if the parties would resume following that plan.  We conclude that the latter aspect of the decree constitutes an improper delegation of judicial authority.  Accordingly, we vacate the portion of

14

the final decree dealing with Wife's visitation and remand for further proceedings consistent with this opinion.

## B. Bifurcation

Wife next argues that the trial court erred in failing to bifurcate the divorce and issue temporary, as opposed to final, parenting orders. Wife notes that the final divorce decree "did not set forth a graduated parenting schedule," but rather, utilized a reunification process "originally envisioned by [Dr.] Garber" subject to the involvement of Tucker as discussed above. (Quotation omitted.) Wife contends that "[a]s a result of the Trial Court's failure to establish a graduated schedule, any changes in the schedule set forth in the Final Divorce Decree would require an order of modification" subject to the requirements of RSA 461-A:11 (2018). Because we vacate the visitation portion of the final decree for the reasons discussed above, we find it unnecessary to address this issue on appeal.

## C. Failure to Make Findings

Finally, Wife argues that the trial court erred by "failing to make findings or provide a rationale for its orders" on the issues she now appeals. Although Wife concedes that the trial court "made findings and explained its reasons for making the unequal [property] division," in accordance with RSA 458:16-a, IV (2018), she argues that it erred by failing to "make findings [or] provide a rationale for" its denial of her requests to "reconsider and change the orders she challenged" on reconsideration.

Wife cites no authority for the proposition that a trial court that has made the requisite findings and rulings under RSA 458:16-a, IV in its final divorce decree is nevertheless also required to explain its reasoning for denying a motion to reconsider that decree. Having found no authority for such a requirement ourselves, we reject Wife's argument on appeal. Cf. Matz v. Matz, Docket No. 298424, 2011 WL 149970, at *2 (Mich. Ct. App. Jan. 18, 2011) (noting that "[n]o rule requires a court to state its reasons for denying a motion for reconsideration" of its custody order and distinguishing "cases cited by defendant . . . [that held] only that a trial court must make explicit findings regarding the statutory best interest factors when making its original custody determination, and not that it must repeat this procedure when faced with a motion for reconsideration").

> Affirmed in part; reversed in part; vacated in part; and remanded.

BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.